1

2

3

4

5

6

7

8

9

10

11

12

13

14

**United States District Court**
For the Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

        Plaintiff,

  v.

GONZALES & GONZALES BONDS AND
INSURANCE AGENCY, INC., et al.,

        Defendants.

_____/

No. C 09-4029 MHP

**MEMORANDUM & ORDER**

**Re:  Plaintiff's Motion to Dismiss
Counterclaim; Defendants' Motion for a
Judicial Determination Regarding the
Nature of the Case**

15

16

17

18

19

20

21

22

23

24

      Defendant Gonzales & Gonzales Bonds and Insurance Agency, Inc. ("G&G") is engaged in posting immigration bonds with the Department of Homeland Security ("DHS") for, *inter alia*, the release of aliens from detention pending a determination of the alien's immigration status.  8 C.F.R. § 236.1(c).  Defendant American Surety ("ACS") is a federally-approved surety company for whom G&G posted immigration bonds.  The United States (or "government") sued defendants to collect on certain breached immigration bonds.  Now before the court is defendants' motion regarding the standard of review and discovery matters, and plaintiff's motion to dismiss the counterclaim.  Having considered the parties' arguments fully and for the reasons set forth below, the court enters the following memorandum and order.

25

BACKGROUND

26

I.     Litigation history

27

28

      In 1993, G&G, Farwest Insurance Company ("Farwest"), Amwest Surety Insurance Co. ("Amwest"), and the DHS' predecessor in interest, Immigration and Naturalization Services, became

embroiled in litigation regarding the parties' respective obligations with respect to immigration bonds posted by G&G, Farwest and Amwest.  In 1995, the parties entered into a settlement agreement, which became known as "Amwest I."  The DHS agreed to change several of its policies and implement them during the execution of future immigration bonds.

In 1997, the parties entered into another settlement agreement known as "Amwest II."  The terms of Amwest I were incorporated into Amwest II, and required, *inter alia*, that the DHS send a field memorandum to its officers advising them of the agreed upon "comprehensive guidance for the implementation of the [Amwest I Agreement]."  Docket No. 9 (Counterclaim), Exh. 2 (Amwest II agreement) ¶ 1; *see also id.*, Exh. A to Exh. 2 (Field memo).  Defendants contend this field memorandum was never sent, and consequently, DHS field officers do not know their obligations when they find breach of an immigration bond.  However, the substance of many of the terms of the Amwest agreements are expressly stated in each immigration bond.

In 2003, G&G again filed suit against the DHS in the Central District of California alleging causes of action under the Administrative Procedure Act ("APA") and the Declaratory Judgment Act ("DJA").  After years of motion practice, G&G amended its complaint to replace its causes of action with a sole cause of action for money damages under 28 U.S.C. section 1346(a)(2) (the "Little Tucker Act").  In 2006, the district court transferred the entire action to the Court of Federal Claims. G&G appealed to the Federal Circuit, which held that G&G's claim was not one for monetary relief and, thus, was not within the purview of the Little Tucker Act.  Therefore, the claim was dismissed for lack of jurisdiction.  *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940, 945–46 (Fed. Cir. 2007).

II.    Current Litigation

In August 2009, the DHS simultaneously filed three lawsuits against G&G in San Francisco, Indianapolis and Memphis.  The DHS' complaint for the action filed in San Francisco contains four bonds that its officers declared breached.  It is undisputed that in each instance of breach, defendants posted an immigration surety bond conditioned on the delivery or voluntary departure of the bonded alien.  In each instance, a DHS official determined that the surety bond was breached under 8 C.F.R.

2

section 103.6(e).  Defendants did not appeal these determinations.  The United States now seeks payment of the principal amount of the bond.

Defendants counterclaim against the DHS claiming that seventeen additional and separate bond-breach declarations by the DHS were all improper.  Although they have sent the DHS, under protest, payment equal to the principal amount of the bonds, they have refused to pay the interest, penalties and handling charges that had accrued subsequent to the breach determination.  Defendants claim that the DHS' breach determination was in error and seek return of their payments.  Specifically, they claim that the DHS itself breached the immigration bond by:  1) failing to send an I-340 demand as required; 2) failing to send G&G a fully completed Amwest Questionnaire and attach a photograph with every demand; 3) failing to acknowledge proof of the alien's voluntary departure; 4) failing to send the removal notice within ninety days of the final order of removal of the bonded alien; 5) failing to send the notice of bond breach by certified mail; and 6) failing to allow G&G to inspect the bonded alien's A-file to determine the propriety of the breach determination.

LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant.  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A motion to dismiss should be granted if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific

3

1    task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*,

2    129 S. Ct. at 1950.

3        "[A]llegations of material fact are taken as true and construed in the light most favorable to

4    the non-moving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).  The

5    court need not, however, accept as true pleadings that are no more than legal conclusions or the

6    "formulaic recitation of the elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949–50 (quoting

7    *Twombly*, 550 U.S. at 555).  "[A] court may take judicial notice of 'matters of public record,'" *Lee v.*

8    *City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) (quoting *Mack v. South Bay Beer Distrib.*,

9    798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged

10   in a complaint and whose authenticity no party questions, but which are not physically attached to

11   the pleading" without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary

12   judgment, *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by*

13   *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).  "The district court will not

14   accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by

15   other allegations or exhibits attached to or incorporated in the pleading." 5C Charles Alan Wright &

16   Arthur R. Miller, *Federal Practice & Procedure* § 1363 (3d ed. 2004).

17

18   <u>DISCUSSION</u>

19       The parties' major arguments all boil down to one essential issue:  whether this action is akin

20   to a mine-run civil suit, or whether the bonds are an administrative instrument such that their breach

21   must be determined by the DHS in accordance with 8 C.F.R. section 106(e).  Specifically,

22   defendants seek de novo review of the government's breach determination, whereas the United

23   States seeks the arbitrary and capricious standard of review generally employed in APA actions.

24       Defendants claim that the government lacks adequate fact-finding procedures, and therefore

25   de novo review is appropriate.  Alternatively, they claim that even if adequate procedures exist, the

26   immigration bonds at issue are akin to ordinary commercial contracts, and therefore de novo review

27   is appropriate.  After finding that adequate fact-finding procedures exist, the court holds that even

28                                                    4

United States District Court

For the Northern District of California

though immigration bonds are contracts, the arbitrary and capricious standard is nonetheless appropriate for review of the government's bond-breach determinations.  Finally, the court addresses the jurisdictional propriety of defendants' counterclaim and allows limited discovery.

I.      Fact-finding procedures

Facts determined by an agency are subject to de novo review when "the [agency] action is adjudicatory in nature and the agency factfinding procedures are inadequate."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *United States v. Healy Tibbitts Constr. Co.*, 713 F.2d 1469, 1474 n.4 (9th Cir. 1983).  Defendants argue that the agency fact-finding process here is inadequate because there is no agency with appellate jurisdiction over the bond breach-determination, and because the agency is not required to review the alien's entire A-file before making its breach determination.

According to the regulatory scheme, if an alien fails to appear, "[t]he district director having custody of the file . . . shall determine whether the bond shall be declared breached or cancelled and shall notify the obligor on Form I-323 or Form I-391 of the decision, and, if declared breached, of the reasons therefor, and of the right to appeal . . . ."  8 C.F.R. § 103.6(e).  The fact-finding procedures to be utilized by the district director in reaching this determination are not specified in the Code of Federal Regulations, nor do they appear elsewhere in the record.  *But cf.* Docket No. 38 (Talley Dec.) (specifying the governing law that the district director must apply).  The district director must, however, provide the reasons for his determination of breach in the notice of breach sent to the obligor.  8 C.F.R. § 103.6(e); *see also* Docket No. 1 (Complaint), Exh. B (Record of Proceedings) at 9 (Notice of breach).  Once the district director has reached his decision, the obligor can challenge that decision either through the appeals process laid out in 8 C.F.R. section 103.3, or through a motion to reopen or reconsider as provided in 8 C.F.R. section 103.5.

A.      Jurisdiction

Defendants argue that the agency fact-finding process is inadequate because the agency's appeals process is broken.  Specifically, they contend that the Administrative Appeals Office ("AAO") lacks jurisdiction to hear appeals from bond-breach determinations.  "The [AAO] is the

United States District Court

For the Northern District of California

appellate body which considers cases under the appellate jurisdiction of the Associate

Commissioner, Examinations." 8 C.F.R. § 103.3(a)(1)(iv). "Decisions under the appellate

jurisdiction of the Associate Commissioner, Examinations, are listed in § 103.1(f)(2) [sic] of [8

C.F.R.]." *Id.* § 103.3(a)(1)(ii).[1]  Up until February 28, 2003, 8 C.F.R. section 103.1(f)(3)(iii)(A)

gave the Associate Commissioner for Examinations appellate jurisdiction over bond-breach

determinations.  *See* Docket No. 35 (Govt. Supp. Brief), Exh. A (8 C.F.R. § 103.1, as in effect on

February 28, 2003).  However, on March 6, 2003, the Secretary of the DHS issued a final rule

repealing much of 8 C.F.R. section 103.1, including subsection 103.1(f)(3)(iii)(A).  *See* Delegations

of Authority, 68 Fed. Reg. 10,922, 10,922 (Mar. 6, 2003).  That final rule indicated that it "delete[d]

delegations of authority at 8 CFR 103.1 that reflect the structure of the former INS and therefore no

longer provide accurate information . . . . Delegations to replace the former § 103.1 will be in place

on March 1, 2003, but are not required to be, and will not be promulgated as rules or codified in the

Code of Federal Regulations." *Id.*

The process for an AAO appeal is laid out in 8 C.F.R. section 103.3, which was not

otherwise affected by the repeal of Section 103.1(f).  The district director who determines that a

bond has been breached must first notify the obligor of the decision, the reasons for the decision, and

the right to appeal.  8 C.F.R. § 103.6(e).  The obligor then has thirty days to appeal the decision to

the AAO.  *Id.* § 103.3(a)(2)(i). The obligor may also submit a brief with his appeal, including any

evidence that he wishes the agency to consider.  *Id.* § 103.3(a)(2)(i), (vi); *see* Docket No. 37 (Rhew

Dec.) ¶ 4.[2]  The appeal and the briefs become part of the record.  8 C.F.R. § 103.3(a)(1)(iii)(C).  The

appeal is first reviewed by the official who made the unfavorable decision; if that official still finds

the bond to have been breached, then he must forward the appeal and the related administrative

record to the AAO.  *Id.* § 103.3(a)(2)(ii)–(iv).[3]  The party appealing can also request oral argument,

which the AAO may grant in its discretion.  *Id.* § 103.3(b).  Thus, the entire procedure by which an

obligor may file an appeal of the bond-breach determination to the AAO continues to be specified by

valid regulations; it is only the actual authority of the AAO to hear the appeal that is questioned by

defendants.[4]

6

United States District Court

For the Northern District of California

On March 1, 2003, the Secretary of the DHS issued a delegation vesting the Bureau of Citizenship and Immigration Services ("BCIS") with the "[a]uthority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)[sic](iii) (as in effect on February 28, 2003)."  Docket No. 36 (McNamara Dec.), Exh. A (Delegation) at 3; *see also id.* at 5 ("Officers and employees of the former Immigration and Naturalization Service . . . will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003 . . . .").[5]  This delegation was made pursuant to 6 U.S.C. section 112(b)(1) and 8 C.F.R. section 2.1, which grant the Secretary of the DHS authority to delegate any of the authorities and functions in his department.

Defendants argue that the Secretary of the DHS did not validly delegate authority to the AAO to adjudicate appeals because the delegation was not published in accordance with 5 C.F.R. section 553.  Under this Section, agencies are required to publish proposed substantive rules in the Federal Register at least 30 days before those rules become effective, and to consider any comments submitted by interested parties.  *Id.* § 553(b)–(d).  However, these "notice and comment" procedures are not required for "rules of agency organization, procedure or practice."  *Id.* § 553(b)(A).  Therefore, the Secretary's delegation of appellate jurisdiction to the AAO is valid without publication in the Federal Register, so long as it is a rule of agency organization, procedure or practice.

The Secretary of the DHS, in promulgating the final rule which deleted Section 103.1(f) specifically found that "[c]ompliance with 5 U.S.C. 553 as to notice of proposed rulemaking or delayed effective date is unnecessary as this rule relates to agency organization and management." Delegations of Authority, 68 Fed. Reg. 10,922, 10,922 (Mar.  6, 2003); *see also* 8 C.F.R. § 2.1 ("A delegation of authority or function may in the Secretary's discretion be published in the Federal Register, but such publication is not required.").  The court, however, "need not accept the agency characterization at face value," *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003), and reviews de novo the question of whether the rule is procedural or substantive.  *See Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir.  2001).

United States District Court

For the Northern District of California

1    "For purposes of the APA, substantive rules are rules that create law.  These rules usually

2    implement existing law, imposing general, extrastatutory obligations pursuant to authority properly

3    delegated by Congress."  *S. Cal. Edison Co. v.  Fed. Energy Regulatory Comm'n*, 770 F.2d 779, 783

4    (9th Cir. 1985).  Procedural rules, on the other hand, "are those that are 'legitimate means of

5    structuring [the agency's] enforcement authority.'"  *Erringer v. Thompson*, 371 F.3d 625, 633 n.15

6    (9th Cir. 2004) (alteration in original) (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1055

7    (D.C. Cir. 1987)).  "A rule fits within this [procedural] exemption if it does not 'alter the rights or

8    interests of parties.'  A rule that simply prescribes 'the manner in which the parties present

9    themselves or their viewpoints to the agency' does not alter the underlying rights or interests of the

10   parties."  *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 349 (4th Cir. 2001) (quoting *JEM*

11   *Broad. Co. v. Fed. Comm. Comm'n*, 22 F.3d 320, 326 (D.C. Cir. 1994)).  A procedural rule does not

12   become substantive merely because it has a substantive impact, as by denying parties the

13   opportunity to appeal if they fail to comply with certain procedures.  *Sequoia Orange Co. v. Yeutter*,

14   973 F.2d 752, 757 (9th Cir. 1992).

15       The above cases demonstrate that changes in the timing, requirements or manner in which an

16   application or petition is made are generally considered procedural changes.  *See, e.g.*, *Erringer*, 371

17   F. 3d at 633 n.15 (finding that a rule requiring Medicare contractors to develop local coverage

18   determinations to qualify for automated review is procedural); *Inova Alexandria Hosp.*, 244 F.3d at

19   349–50 (finding that a rule dismissing appeals for failure to timely file is procedural); *JEM Broad.*

20   *Co.*, 22 F.3d at 327 (finding that a rule dismissing incomplete applications without opportunity to

21   amend was procedural).  The delegation promulgated by the Secretary here does not alter the rights

22   or obligations of the party making the appeal; as noted above, those rights and obligations are

23   properly laid out in a separate section of the Code of Federal Regulations.  Likewise, the delegation

24   does not alter the right to make an appeal; it only identifies the body that will exercise jurisdiction

25   over the appeal once the appeal is made.[6]  Since the delegation specifies the internal organization of

26   the agency, it falls within the procedural exception to 5 U.S.C. section 553, and does not require

27

28

United States District Court
For the Northern District of California

1  publication in order to be effective.[7]  Thus, the agency's fact-finding procedures include a valid

2  appellate process.

3        B.      Adequacy of procedures

4        Defendants argue that independent of AAO jurisdiction, the fact-finding procedures utilized

5  by the DHS are inadequate because the agency does not review all relevant information.

6  Specifically, they claim that because information might exist in an alien's A-file that could

7  contradict the bond-breach determination, the agency's procedures are inadequate.  The agency's

8  fact-finding procedures, however, include an opportunity for the obligor appealing the bond-breach

9  determination to submit evidence that contradicts the breach determination.  Once a bond-breach

10  determination has been made, the obligor may appeal, and may submit a brief and any pertinent

11  evidence with his appeal.  8 C.F.R. §§ 103.6(e), 103.3(a)(2).  The district director then reviews the

12  brief and additional evidence.  If he continues to believe that the bond was breached, he forwards the

13  administrative record along with the brief and any supporting evidence to the AAO, which then

14  reviews the appeal.  *Id.* § 103.3(a)(2)(iii).  The AAO also has authority to grant oral argument on

15  appeal.  *Id.* § 103.3(b).

16        In the Ninth Circuit, adequate fact-finding procedures are generally found where an

17  aggrieved party is permitted an opportunity to present arguments and evidence challenging the

18  agency's decision.  *See Pacific Architects & Engineers, Inc. v. Dep't of State*, 906 F.2d 1345 (9th

19  Cir. 1990).  There, a government contractor objected to the State Department's decision, in response

20  to a FOIA request, to disclose certain information about the contractor's work.  *Id.* at 1345–46.  The

21  State Department provided the contractor with notice of the FOIA request, and an opportunity to

22  present objections and evidence.  *Id.* at 1348.  The Department considered the contractor's

23  objections, reached a decision, issued a statement of its reasons for this decision, and provided the

24  contractor a second opportunity to object.  The court found that these fact-finding procedures were

25  adequate.  *Id.*; *see also Conax Fla. Corp. v. United States*, 824 F.2d 1124, 1129 (D.C. Cir. 1987)

26  ("[T]he fact-finding procedures employed by the agency were by no means inadequate.  Indeed,

27  there were absolutely no restrictions on the amount or type of evidence that [the objecting party] was

28

9

permitted to submit to the [agency].”); *Healy Tibbitts*, 713 F.2d at 1474–75 (indicating in dicta that

an agency adjudication, in which “[t]he company had several opportunities to offer evidence in

support of its contention,” was adequate).  Likewise, the DHS’ fact-finding procedures here include

an opportunity for the obligor to present to the district director and the AAO any evidence it

considers pertinent.  This procedure provides a means for the agency to gather facts contrary to its

initial determination.  The fact that the DHS’ initial determination was made before hearing the

obligor’s objections does not affect the adequacy of the fact-finding procedure.  The AAO reviews

the decision of the district director de novo.  *See* Docket No. 31-2 (Ginsburg Dec.), Exh. E

(Ombudsman Memorandum) at 2.  The agency’s decision does not become final until this fact-

finding procedure has been carried out, i.e., until the obligor has been given an opportunity to

respond.

    In *Proietti v. Levi*, 530 F.2d 836 (9th Cir. 1976), the court gave a similarly broad

interpretation of what constitutes adequate fact-finding procedures.  There, the Attorney General’s

office investigated a car accident on a military base by employing relatively meager fact-finding

procedures:  “The factual information in the report prepared for the Attorney General was gathered

by soliciting a statement from [the driver] and an affidavit from his supervisor.  Accident reports and

answers to interrogatories in the state court action [in which the driver sought representation] were

also considered.”  *Id.* at 838.  The court found these fact-finding procedures to be adequate:  “While

the investigation may not have been painstakingly thorough, the same procedures, especially

solicitation of affidavits, could have been used to obtain any necessary additional information.  Any

defects in the investigation were not the result of the agency’s ‘fact-finding procedures’.”  *Id.*  The

agency held no evidentiary hearing, nor did it specifically afford the driver an opportunity to

introduce evidence or object to the agency’s determination.  *Id.* at 837–38.  Thus, even if the

exclusion of the A-file from the administrative record renders the DHS’ investigation far from being

“painstakingly thorough,” the existence of procedures to obtain further information renders the fact-

finding adequate.  Since the party appealing the bond-breach determination can submit any evidence

it wishes, the information which the agency can obtain through its fact-finding procedures is

10

United States District Court

For the Northern District of California

1    limitless.  The fact that no additional evidence was gathered in this particular case, because

2    defendants chose not to appeal, is immaterial.  *See Conax*, 824 F.2d at 1129 (finding that where fact-

3    finding procedures were adequate, party's decision not to submit additional evidence "is an

4    imprudence for which there is no judicial remedy"); *Healy Tibbitts*, 713 F.2d at 1475 (indicating that

5    fact-finding procedures are not inadequate merely because a party fails to offer evidence in support

6    of its contention).

7         By contrast, the Fifth Circuit confronted a case of inadequate fact-finding procedures in

8    *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979).  There, a federal employee was suspended without

9    pay after accusing two of her superiors of corruption.  *Id.* at 771.  The two officials accused of

10   corruption were themselves involved in the fact-finding process which led to the employee's

11   suspension.  *Id.* at 782 ("The chief inadequacy in the agency fact-finding procedures used in this

12   case was the pervasive role played by . . . the officials [who were] explicitly accused of

13   corruption.").[8] Unlike *Porter*, there exist no allegations of conflict of interest here.  Defendants do

14   not contend that the deputy director or the AAO is not an impartial arbiter of bond-breach

15   determinations.[9]

16        Review of an alien's A-file on every bond-breach appeal may improve the accuracy of bond-

17   breach determinations; but simply because more accurate fact-finding measures exist does not mean

18   that the agency's current fact-finding procedures are inadequate.  Courts have yet to find an agency's

19   fact-finding procedures inadequate under similar circumstances, even though the procedures being

20   reviewed could have been improved.  *See Proietti v. Levi*, 530 F.2d at 838; *see also Safety Nat'l Cas.*

21   *Corp. v. Dep't of Homeland Sec.*, No. H-05-cv-2159, 2008 U.S. Dist. LEXIS 112659 at *21–*25

22   (S.D. Tex. Mar. 24, 2008) (finding DHS fact-finding procedures for bond-breach determinations to

23   be adequate).  Thus, because obligors may submit any pertinent evidence and arguments challenging

24   the bond-breach determination, the fact-finding procedures employed by DHS when making breach

25   determinations are adequate.  This does not mean, however, that every instance of bond-breach

26   determination made by the government is proper.  The court now turns to whether immigration

27

28
                                              11

United States District Court

For the Northern District of California

1 bonds are akin to commercial contracts, and if so, whether their contractual nature requires de novo

2 review of the government's bond-breach determination.

3

4

5 II.    Nature of immigration bonds

6          In order to obtain de novo review, defendants claim that immigration bonds are

7 indistinguishable from commercial contracts entered into by private parties.  This appears to be an

8 issue of first impression in this Circuit.  Bail bonds, but not immigration bonds, have consistently

9 been held to be contracts between the government, and the criminal defendant and his surety.

10 *United States v. Toro*, 981 F.2d 1045, 1047 (9th Cir. 1992) ("courts apply general principles of

11 contract construction when interpreting bail bonds."); *see United States v. Figuerola*, 58 F.3d 502,

12 503 (9th Cir. 1995) (applying contract principle of unilateral mistake to bail-bond breach analysis).

13 However, bail bonds are distinguishable from immigration bonds since bail-bond breach

14 determinations are made by the district court, not an agency.  Moreover, with respect to immigration

15 bonds, the Code of Federal Regulations sets forth both a regulatory scheme and an appeals process

16 regarding breach.

17          According to basic principles of contract law, a contract is an agreement to do or not to do a

18 certain thing.  Cal. Civ. Code § 1549.  And when a contract is reduced to writing, the intention of the

19 parties is to be ascertained from the writing alone, if possible.  *Id.* § 1639.  The face of the

20 immigration bond document itself demonstrates that the parties intended to form a contract.

21 Specifically, the first general term and condition of the bond states that "[t]he express language of

22 this bond *contract* shall take precedence over any inconsistent policies or statements" and that

23 "Federal law shall apply to the interpretation of the *contract*, and its terms shall be strictly

24 construed."  Complaint, Exh. A (Bond Form) at 2 (emphases added).  Likewise, "[n]othing in [the

25 bond] *contract* shall affect the obligor's right to raise any defense to a bond breach in a timely

26 administrative appeal" and "[a]ny obligation or duty imposed on an obligor by this *contract* applies

27 equally to all co-obligors."  *Id.* (emphases added).

28
                                                        12

United States District Court

For the Northern District of California

Contract principles, such as consideration and liquidated damages, are also referenced throughout the bond. Each type of immigration bond states either: "In *consideration* of the granting of the application of the above alien for release from custody under a warrant of arrest issued by the Attorney General charging that he/she is unlawfully in the United States, provided that . . . ," or "In *consideration* of the granting of the application of the above alien for permission to enter the United States, providing there . . . ," or "In *consideration* of the granting by the Attorney General of an application or the above alien to depart voluntarily from the United States, provided there . . . ." Bond Form at 4 (emphases added). The section of the bond where the bond amount is entered states: "In *consideration* of the facts recited in . . . the obligor above named, by subscribing hereto, hereby declares that he/she is firmly bound unto the United States in the sum of [dollar amount] as *liquidated damages* and not as a penalty, which sum is to be paid to the United States immediately upon failure to comply with the terms set forth in . . . ." *Id.* at 3 (emphases added). The bond cites to 28 U.S.C. section 2415 when stating that "[t]he statute of limitations that applies to actions for monetary damages from a breached bond is six years from the date of the breach event. (28 U.S.C. 2415)[.]" *Id.* at 2. Section 2415 sets forth the statute of limitations in contract actions brought by the United States.

In practice, the government has treated immigration bonds as contracts. The Amwest agreements specifically and repeatedly refer to immigration bonds as contracts. Docket No. 11 (Motion for Summary Judgment), Exh. A (Amwest I agreement) ¶ 2 ("The attached policy statements are binding on the parties in their contractual relationship formed through the execution of any immigration bond contract, whether in the past or in the future, using the bond agreement (INS Form 1-352) attached to this Agreement as Exhibit K."); *see also Safety Nat'l*, 2008 U.S. Dist. LEXIS 112659 at *43 n.19 (the draft field memorandum and Amwest memorandum associated with the Amwest I agreement explained that "[w]hen an obligor . . . attaches a copy of its bond contract to its [FOIA] request, the office processing that request should not withhold any records under either of the FOIA personal privacy exemptions . . . except for highly personal ones . . . which have no reasonable connection to the bond.").

13

United States District Court

For the Northern District of California

1     Other courts are in accord.  This identical issue was recently decided by a sister court that

2  also found immigration bonds to be contracts.  *Safety Nat'l*, 2008 U.S. Dist. LEXIS 112659 at

3  \*51–\*53.  In *Matter of Allied Fidelity Ins. Co.*, 19 I. & N. Dec. 124 (1984), a commissioner at the

4  United States Board of Immigration Appeals decided an appeal from the district director's decision

5  that the conditions of a bond were violated when the alien was not surrendered as demanded.  The

6  commissioner found that immigration delivery bonds "are formal instruments governed by the

7  general provisions of 8 C.F.R. 103.6(a), (b), and (e).  These instruments create a contract between

8  the Service [INS], the bonding agent and attorney-in-fact, and the surety company." *Id.* at 125; *see*

9  *also United States v. Minnesota Trust Co.*, 59 F.3d 87 (8th Cir. 1995) (the court relied upon contract

10  principles—obligations placed upon the obligor and obligee by the bond instrument—to determine

11  the government's responsibilities); *United States v. Olson*, 47 F.2d 1070, 1070 (8th Cir. 1931)

12  (where both the government and the surety company had signed the bond, the government could be

13  entitled to payment because there existed "a contract between the United States on one hand and the

14  signers thereof on the other.").[10]  Indeed, even the government has argued for this conclusion in the

15  past.  *See Ciniglio v. Thornburgh*, No. 90-3939, 1991 WL 276081 at \*2 (E.D. La. Dec. 17, 1991)

16  (the government argued that the bond instrument was a contract between the government and

17  bonding company only); *Guirola-Beeche v. United States Dep't of Justice*, 662 F. Supp. 1414, 1418

18  (S.D. Fla. 1987) (same).

19     The express language of the bond instrument, coupled with what appears to be the parties'

20  intention, leads to the inevitable conclusion that the immigration bonds at issue are contracts.  The

21  cases cited by the government in support are inapposite because they do not discuss the contract

22  issue; instead, they discuss whether the surety can sue the government based on a subrogation

23  theory.  *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1163 (Fed. Cir. 1985) ("we hold that

24  both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act surety against

25  the United States for funds allegedly improperly disbursed to a contractor."); *Ins. Co. of the West v.*

26  *United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001) ("No act here limits the right of subrogees to

27  bring suit against the government, and thus sovereign immunity presents no barrier to such an

28

14

1  action."). Here, the surety is suing in its own stead; consequently, *Balboa* does not aid the

2  government, and as that court stated: "a surety, as bondholder, is as much a party to the Government

3  contract as the contractor." 775 F.2d at 1160.[11] The conclusion that immigration bonds are

4  contracts between the surety and the government does not end the inquiry. The court now addresses

5  the proper standard of review of the government's bond-breach determinations.

6

7  III.    Standard of review

8          Defendants have not provided, and the court has not been able to find, any authority that

9  employs de novo review under similar circumstances. To the extent courts have found immigration

10  bonds to be contracts, they have nonetheless found de novo review inappropriate. Specifically, in

11  light of the regulatory scheme described above, every court to address immigration bonds has

12  employed the arbitrary and capricious standard of review. A sister court addressing this identical

13  issue also found immigration bonds to be contracts, but nonetheless applied the arbitrary and

14  capricious review to the agency's bond-breach determinations. *Safety Nat'l*, 2008 U.S. Dist. LEXIS

15  112659 at *51–*53. All other courts that discuss the standard of review have also employed the

16  arbitrary and capricious standard. *Bahramizadeh v. INS*, 717 F.2d 1170, 1173 (7th Cir. 1983)

17  (reviewing bond-breach determinations under the APA framework); *see Castaneda v. Dep't of*

18  *Justice*, 828 F.2d 501, 502 (8th Cir. 1987) (immigration bond-breach determination reviewed under

19  the APA framework); *Ruiz-Rivera v. Moyer*, 70 F.3d 498, 500–01 (7th Cir. 1995) (determining

20  whether "INS' decision that the bond conditions were substantially violated was plainly erroneous or

21  inconsistent with 8 C.F.R. § 103.6(e)"); *Ahmed v. United States*, 480 F.2d 531, 543 (2d Cir. 1973)

22  (court analyzed substantial breach, as required by 8 U.S.C. section 103.6). Indeed, the government

23  points to numerous district court opinions, all of which employ the arbitrary and capricious standard

24  of review. Docket No. 30 (DOJ Reply) at 4–5. Consequently, defendant's argument—that breach of

25  contract actions are always reviewed de novo—misses a key logical step: where a regulatory

26  scheme exists, finding a contract does not automatically make the APA standard of review

27  inapplicable.

28

United States District Court

For the Northern District of California

This is not the first time that APA review has applied to a contract with the government. Both the Federal Circuit and the Court of Federal Claims have recognized that a claimant's cause of action can arise by virtue of final agency action even though the claimant is also party to an underlying contract with the government. *See Doty v. United States*, 24 Cl. Ct. 615, 626 n.14 (1991) ("contract claims like the one in this case constitute appeals from final agency action subject to judicial review. Thus, we turn to the APA 5 U.S.C. § 706, for standards to guide review of the agency action in question."); *Foote Mineral Co. v. United States*, 654 F.2d 81 (Cl. Ct. 1981) (lessee's challenge to final agency determination regarding government lease reviewed under the APA).

*United States v. Morrison*, 370 F. Supp. 193 (D.C. Va. 1974), does not help defendants. There, defendant had entered into a contract with the government for the storage of household goods. The contract required the contracting officer to adjudicate disputes of fact, but not law, regarding a fire. Consequently, the court based its holding on a de novo analysis of the legal conclusion only. Although the court excoriated the contracting officer for making "no more than a pro forma conclusion of liability in favor of the Government by signing a printed form . . . ," *id.* at 197, it did not allow supplementation of the factual record other than by stipulation amongst the parties, *id.* at 197–98.

Other cases cited by defendants are all unpersuasive. *Allied Fidelity*, 19 I. & N. Dec. 124, does not speak to the standard of review courts should use when reviewing bond-breach decisions. Moreover, it explicitly holds that bond-breach determinations are governed by the regulations specified in 8 C.F.R. section 103.6(e). In *Marathon Oil Co. v. Babbitt*, 938 F. Supp. 575, 581 (D. Alaska 1996), the court reviewed only the statute of limitations issue de novo because the limitation period did not apply exclusively to the government. Defendants point to no generally applicable laws that somehow bar the government's claim. Moreover, *Marathon Oil* specifically found that administrative exhaustion was required. *Id.* n.12. In *County of Suffolk v. United States*, 19 Cl. Ct. 295, 299 (1990), the contracts were at one time subject to a regulation that limited the court's scope of review. Due to the repeal of that regulation, the court found de novo review appropriate. *Id.*

16

1   Here, however, a regulatory scheme is currently in place.  Other cases cited by defendants do not

2   specify the standard of review they are employing.  *See Suburban Mortgage Assoc., Inc. v. Dep't of*

3   *Housing & Urban Dev.*, 480 F.3d 1116 (Fed. Cir. 2007) (no discussion of standard of review); *Int'l*

4   *Engineering Co., Div. of A-T-O, Inc. v. Richardson*, 512 F.2d 573 (D.C. Cir. 1975) (same); *Olson*,

5   47 F.2d 1070 (pre-dating regulatory scheme); *Minnesota Trust*, 59 F.3d 87 (does not discuss scope

6   of review to be used by federal courts); *Ciniglio*, 1991 WL 276081 (court did not specify the

7   standard of review it employed).  Finally, defendants cite numerous cases regarding the standard of

8   review regarding governmental contracts in the absence of a regulatory scheme.  *See* Docket No. 28

9   (Defendants' Motion) at 13–14.  These cases miss the mark:  the question here is the standard of

10  review in light of an extensive regulatory scheme.  None of the cited cases discuss this issue.

11  Defendants' arguments regarding the lack of dispute resolution mechanisms within the bond

12  instruments themselves are likewise misplaced.  The instrument need not explicitly incorporate the

13  Code of Federal Regulations in order to make the regulations applicable.  In sum, the court finds no

14  authority requiring, or even suggesting, that de novo review is proper where a regulatory scheme

15  exists.

16          This conclusion is further strengthened by the true nature of the action—a challenge to a

17  final agency decision.  *Doe v. United States*, 372 F.3d 1308, 1315 (Fed. Cir. 2004) (courts must look

18  "to the true nature of the action instead of merely relying on the plaintiff's characterization of the

19  case." (internal citations omitted)); *Suburban Mortgage*, 480 F.3d at 1124 (discussing true nature of

20  the claim to determine Little Tucker Act jurisdiction).  Here, defendants claim that the United States

21  itself breached its bond obligations when declaring the bond breached.  In other words, defendants

22  argue they are excused from paying the bond amount because the United States failed to

23  substantially comply with the terms of the bond.  Therefore, they claim that the agency's action, in

24  declaring the bond breached, was improper.  Authorities that use the arbitrary and capricious

25  standard with respect to immigration bond-breach claims made by non-governmental plaintiffs are

26  therefore persuasive.  The fact that the United States brought suit to collect, subsequent to its

27  declaration of bond breach, does not change the analysis.[12]  Defendants do not explain the difference

28

                                              17

1   between the United States' complaint and their counterclaim.  Defendants' claim that the DHS has

2   never before been alleged to have itself breached the bond is similarly unpersuasive.  Since the court

3   is, at base, reviewing a final agency declaration of breach, the oft-used arbitrary and capricious

4   standard applies.

5       Under this standard, the obligations set forth in statutes, regulations, case law and the terms

6   specified in the bonds themselves must all be considered when the agency declares a bond breach.

7   The same holds true regarding the Amwest agreements.  Indeed, many of the Amwest provisions

8   have been incorporated into the bonds themselves.  For instance, according to the terms of the bond

9   instrument, the agency must determine whether cancellation of the bond has occurred, or whether

10  any mitigation is necessary.  *See generally* Bond Form.  And the government concedes as much.

11  DOJ Reply at 12 (if a DHS "bond breach determination fails to take into account a material

12  provision of the Amwest Agreements, then the final agency action could be considered arbitrary or

13  capricious . . . ."); *see also Safety Nat'l*, 2008 U.S. Dist. LEXIS 112659 (finding breach

14  determinations to be arbitrary and capricious where the DHS failed to follow a specified term or

15  condition on Form I-352).

16      Having decided the appropriate standard of review, the court now determines which specific

17  bond-breach determinations are properly before the court.

18  IV.    <u>Counterclaim</u>

19      The government invoked this court's jurisdiction pursuant to 28 U.S.C. section 1331, federal

20  question jurisdiction, and 28 U.S.C. section 1345, jurisdiction when the United States is plaintiff, to

21  enforce four immigration bond-breach determinations and to collect the associated debt.  There is no

22  dispute that this court has jurisdiction over the claims in the complaint.  Defendants filed a

23  permissive counterclaim, challenging as unlawful seventeen determinations of bond breach and

24  seeking the return of associated payments.  The government claims the court does not have

25  jurisdiction over defendants' counterclaim.

26      Defendants' counterclaim is premised on two jurisdictional hooks:  a claim under the Little

27  Tucker Act, or alternatively, a claim under the APA.  These claims are mutually exclusive.  *See*

28

**United States District Court**
For the Northern District of California

1   *Richardson*, 512 F.2d at 567 (government contracts within the ambit of the Tucker Act fall outside

2   the contemplation of the APA).  Each is discussed in turn.

3        A.   <u>Little Tucker Act</u>

4        The Little Tucker Act ("LTA") provides that this court shall have concurrent jurisdiction

5   with the Court of Federal Claims for a civil claim against the United States, not exceeding $10,000,

6   which is founded upon any "any express or implied contract with the United States . . . ."  28 U.S.C.

7   § 1346(a)(2).  The jurisdictional limit "is not violated when plaintiffs combine a number of claims

8   that are individually less than $10,000 but cumulatively exceed that amount."  *Baker v. United*

9   *States*, 722 F.2d 517, 518 (9th Cir. 1983).  Since defendants seek monetary damages based on

10  immigration bond contracts, Little Tucker Act jurisdiction is proper.

11       The government makes three arguments regarding the impropriety of defendants' LTA

12  claim:  1) immigration bonds are not contracts; 2) it was not the government's breach that caused

13  defendants' damages, but defendants' failure to deliver the bonded aliens; and 3) defendants'

14  voluntary payment of the principal amount of the breached bonds gives rise to a specific, equitable

15  remedy, not the compensatory or substitute remedy of money damages.  The first argument is

16  disposed of above.  The second argument is premature, as the government's failure to fulfill its own

17  obligations under the bond contracts may have rendered arbitrary and capricious the district

18  director's declaration of bond breach.  The third argument is discussed below.

19       The government contends that no cause of action can be had because defendants voluntarily

20  paid the face amount of the bonds.  Prior to filing their counterclaim, defendants paid the

21  government the principal amount of all seventeen bonds, but refused to pay the interest, penalties

22  and handling charges that had accrued.  The government's argument is premature because the court

23  cannot determine, at the pleading stage, whether the payments were made voluntarily.  *See Richfield*

24  *Oil Corp. v. United States*, 248 F.2d 217, 224 (9th Cir. 1957) ("If the court, after hearing evidence,

25  were to find that the alleged telephone conversation took place and that the actual agreement

26  between the United States on the one hand and Richfield, on the other, was that Richfield might pay

27  the demanded sum under protest and then proceed by suit to recover it back in order to litigate the

28   

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   question of its liability for any further sum, then it would be improper to hold that Richfield was

2   barred from maintaining this action.").  Defendants have alleged that their payments were not

3   voluntarily made.  *See, e.g.*, Counterclaim ¶¶ 30, 37, 44.  Consequently, the court cannot now

4   dismiss the counterclaim.  Further, the doctrine may be inapplicable because defendants may have

5   been under a compulsion to pay the face value of the bond in order to minimize the accrual of

6   interest, penalties and handling charges.  *See Richfield Oil*, 248 F.2d at 222 (the "threat or danger of

7   great property loss or heavy penalties" can lead to "no adequate remedy except to submit

8   immediately and seek redress later in the court.").

9           The government also argues that the Little Tucker Act claim should be dismissed because the

10  damages sought by defendants are not compensatory damages.  The government claims that

11  defendants simply seek return of monies, not further compensation from the government.  In other

12  words, the government argues that defendants' counterclaim is for specific relief that happens to be

13  money.  *See Suburban Mortgage*, 480 F.3d at 1124 (lamenting the "cottage industry among lawyers

14  attempting to craft suits, ultimately seeking money from the Government, as suits for declaratory or

15  injunctive relief without mentioning the money.  If successful, a plaintiff could have the case heard

16  under the APA in one or another district court, with appeal to a regional circuit, rather than in the

17  Court of Federal Claims, where money claims against the Government are routinely heard and

18  decided, with appeal in the Federal Circuit.").  Here, defendants specifically mention and seek the

19  return of monies.  In other words, they seek money as compensation for a loss suffered.  *Cf. Katz v.*

20  *Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994).  Indeed, the counterclaim is, at base, a claim for the

21  return of money from the government based on contract, and does not seek payments on any other

22  grounds.  *See Bowen v. Massachusetts*, 487 U.S. 879, 900–01 (1988) (suits seeking to enforce

23  statutory mandates "for the payment of money must not be confused with the question whether such

24  payment, in these circumstances, is a payment of money as damages or as specific relief.").  The

25  government's argument proves too much.  At its logical conclusion, all contractual damages,

26  including liquidated damages, could be characterized as specific relief that happen to be money.

27  This could eviscerate Little Tucker Act jurisdiction.

28

United States District Court

For the Northern District of California

The Federal Circuit has already found the government's argument unavailing. Specifically, when these same defendants failed to pay amounts due under other bonds and their LTA claim was appealed to the Federal Circuit, the court held: "there is a substantive difference between a plaintiff seeking the return of money it already paid the government and a plaintiff never having to pay the government in the first place. Simply stated, if the plaintiff in the second scenario prevails, he would not be receiving monetary damages from the public fisc of the United States." *Gonzales & Gonzales Bonds & Ins. Agency*, 490 F.3d at 945 (internal quotations and citation omitted). The Federal Circuit declined to find jurisdiction specifically because defendants had not paid money to the government. The obvious implication of the Federal Circuit's opinion is that seeking return of monies already paid pursuant to contract creates Little Tucker Act jurisdiction. Here, defendants would receive money from the public fisc if they prevail; consequently, Little Tucker Act jurisdiction is proper.

        B.    <u>APA</u>

The government acknowledges that defendants "can invoke the APA's sovereign immunity waiver and be afforded full relief under the APA . . . ." DOJ Reply at 19. It only claims that defendants have failed to identify the statute or regulation at issue. The provision at issue here, 8 U.S.C. section 103.6, is clear, and the counterclaim could be easily amended accordingly. The APA, however, can only provide a remedy as a last resort. 5 U.S.C. § 704 (judicial review is inappropriate where there exists some "other adequate remedy in a court."). Since a remedy under the Little Tucker Act is available, the concurrent APA claim is improper. For the purposes of appeal, and in the interest of judicial efficiency, the court exercises its discretion to stay the APA claim until final resolution of the Little Tucker Act claim. If the Little Tucker Act claim is eventually found to be improper, defendants may seek relief on their APA claim.[13]

V.    <u>Discovery</u>

Expanding the record is "typically unnecessary to judicial review of agency decisionmaking." *Florida Power & Light Co. v. Lotion*, 470 U.S. 729, 744 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant

21

United States District Court

For the Northern District of California

factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.*

Defendants claim that the government's administrative record was prepared in an arbitrary fashion because it failed to identify all documents upon which the agency relied when it declared the bond breached. In order to expand the record, defendants must demonstrate that "the agency has relied on documents not included in the record. This has been acknowledged as a qualification to or explication of the rule that judicial review is based upon the full administrative record in existence at the time of the agency decision. Some courts have thus permitted discovery when those challenging agency action have contended the record was incomplete, in order to provide a record of all documents and materials directly or indirectly considered by the agency decisionmakers." *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (citations omitted); *see also Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) ("The district court may also inquire outside of the administrative record when it appears the agency has relied on documents or materials not included in the record." (internal quotations and citation omitted)). Indeed, the whole administrative record "is not necessarily those documents that the agency has compiled and submitted as 'the' administrative record. The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quotations and citation omitted). According to the DHS, "[u]pon receipt of an appeal in a case over which the AAO [sic], the district or center *must review the complete case* to determine [the appeal]." Adjudicator's Field Manual Excerpt at 1 (emphasis added). The DHS manual allows the district or center to "forward either the complete A-file or a complete Record of Proceeding to the AAO." *Id.* Thus, the agency appears to consider the alien's entire A-file upon appeal, even if it eventually forwards only the record of proceedings to the AAO. Moreover, the documents contained within the record of proceedings are a subset of the documents contained with the alien's A-file. *Id.* at 2; Rhew Dec., ¶ 3 ("the record that ICE provides to the AAO generally

United States District Court

For the Northern District of California

1   comprises a standardized subset of documents from the A-file relevant to the bond breach

2   determination.").  Consequently, the creation of the record of proceedings itself would require some

3   review of the A-file itself.

4        Defendants also claim that they need the alien's A-file from the government in order to

5   determine whether the agency ignored pertinent information—information that would tend to

6   establish that the government's declaration of breach was in violation of the bond itself, the Amwest

7   agreements, case law, regulations and other authority.  "[D]istrict courts are permitted to admit

8   extra-record evidence: (1) if admission is necessary to determine whether the agency has considered

9   all relevant factors and has explained its decision, (2) if the agency has relied on documents not in

10  the record, (3) when supplementing the record is necessary to explain technical terms or complex

11  subject matter, or (4) when plaintiffs make a showing of agency bad faith."  *Lands Council v.*

12  *Forester of Region One of the United States Forest Serv.*, 395 F.3d 1019, 1030 (9th Cir. 2005)

13  (internal quotations omitted).  The record of proceeding created by the government, which it states is

14  also the administrative record, comprises a select subset of documents from the alien's A-file.  Rhew

15  Dec. ¶¶ 3–15; *id.*, Exh. A (Adjudicator's Field Manual Excerpt) at 1–2.[14]  Among the documents that

16  are included in the record of proceedings are the bond agreement itself, the notice to the obligor to

17  deliver the alien, and the notice stating that the bond has been breached and the basis for that

18  conclusion.  *See* Rhew Dec. ¶ 9, 11–12; Adjudicator's Field Manual Excerpt at 2.  In contrast, the A-

19  file may contain, *inter alia*, a voluntary departure bond, letter to the immigration court establishing

20  self-deportation, notice regarding custody of the alien, and documents regarding lawful reentry.  *See*

21  Docket No. 31-1 (Atler Dec) ¶ 6.  These other documents in the A-file, even if they exist, are

22  generally not made part of the record of proceedings.  *See* Rhew Dec., ¶¶ 8–12 (discussing in detail

23  documents that constitute the record of proceedings).  Although Rhew claims that "[t]he facts

24  necessary for the ICE official or the AAO to evaluate challenges to administrative bond breach

25  determinations are present in the documents that comprise the Record of Proceeding," *id.* ¶ 16, he

26  nowhere mentions these documents identified by the defendants, whose mere existence could render

27  the bond-breach determination arbitrary and capricious.

28

1    Since the agency appears to have reviewed the A-file during its compilation of the record of

2    proceedings, and because the A-file may reveal documents whose admission may be necessary to

3    determine whether the agency has considered all relevant factors and has explained its decision, the

4    government is ordered to produce the A-files pertaining to the immigrants at issue, subject of course

5    to the relevant privileges.  The parties are ordered to meet and confer regarding an appropriate

6    protective order.  Upon completion of this production, defendants may file a motion seeking to

7    expand the administrative record based on the standard stated above.  The government's motion for

8    summary judgment is stayed pending resolution of the motion to expand the record.

9

10

11   CONCLUSION

12       For the foregoing reasons, the court finds that:  1) immigration bond-breach determinations

13   are reviewed under APA standards; 2) defendants' counterclaim stands; and 3) defendants may

14   discover A-files.

15       IT IS SO ORDERED.

16
     Dated: July 27, 2010                                         _____
17
                                                                  MARILYN HALL PATEL
18                                                                United States District Court Judge
                                                                  Northern District of California
19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

**ENDNOTES**

1.       As of February 28, 2003, the jurisdiction of the Associate Commissioner for Examinations was codified at section 103.1(f)(3), not 103.1(f)(2).

2.       Rhew's declaration regarding this issue is admissible. The factual information in the declaration, based on personal knowledge, is neither hearsay nor a legal conclusion. A proper foundation also exists.

3.       Although no standard of review is stated, "the reviewing official may treat the appeal as a motion to reopen or reconsider and take favorable action." 8 C.F.R. § 103.3(a)(2)(iii).

4.       The American Immigration Lawyers' Association has asked the AAO to clarify the source of its jurisdiction since the repeal of 8 C.F.R. section 103.1(f). Docket No. 31-1 (Ginsburg Dec.), Exh. D (USCIS FAQ). In response, the AAO has stated that "[t]o provide clear instructions to the public, the AAO has drafted a proposed rule that will update and re-insert the AAO's appellate jurisdiction in the regulations." *Id.* However, no such rule has been adopted. In December 2005, the Citizenship and Immigration Services Ombudsman recommended that the USCIS and AAO "make available to the public through publication of a regulation or otherwise the appellate standard of review, the process under which cases are deemed precedent decisions, the criteria under which cases are selected for oral argument, and the statistics on decision making by the Administrative Appeals Office." *Id.*, Exh. E (Ombudsman Memo). These recommendations do not appear to have been adopted either.

5.       Defendants claim the delegation document is inadmissible because it was improperly authenticated and lacks foundation. The sponsoring declarant, Philip McNamara, is the Executive Secretary in the Office of the Secretary who, based on personal knowledge, testified that the document is a true and correct copy of the original. Since the document is encompassed by the public records and reports hearsay exception, *see* Fed. R. Evid. 803(8), defendants' objections are overruled.

6.       8 C.F.R. section 106(3) makes clear that the obligor possesses "the right to appeal [a determination of bond breach] in accordance with the provisions of this part." Presumably, if the Secretary had never delegated the authority to hear appeals of bond-breach determinations, he alone would possess jurisdiction over such appeals.

7.       The obligor here suffered no lack of notice from the delegation remaining unpublished. The published regulations require informing any party who has the right to an appeal of the body that has jurisdiction over his appeal. 8 C.F.R. § 103.3(a)(iii)(A). Even though the AAO's jurisdiction was not specified in the Code of Federal Regulations or the Federal Register, it was made known to all interested parties. All obligors against whom a determination of breach is made received "actual and timely notice" of the relevant terms of the delegation (i.e., that the AAO has appellate jurisdiction if they wish to file an appeal); therefore, the DHS' failure to publish the delegation does not invalidate the AAO's jurisdiction over any obligor in breach. *See* 5 U.S.C. § 552(a)(1).

8.       The Fifth Circuit also found "a more fundamental inadequacy" in the failure of the agency, given the employment context of the case, to provide the suspended employee with a full evidentiary hearing. *Porter*, 592 F.2d at 783. It relied heavily on the fact that the other employees would be unwilling to come forward with evidence for fear of retribution. *Id.* This action presents no such issue.

9.       Defendants point to *Doty v. United States*, 24 Cl. Ct. 615 (1991), where detailed fact-finding procedures were found inadequate. That case, however, dealt with an agency's obligation to follow procedure required by law, under 5 U.S.C. section 706(2)(D), not with an agency's fact-finding procedures under 5 U.S.C. section 706(2)(F). Defendants have not cited any law requiring DHS to follow different procedures for bond-breach determinations. *Foote Mineral Co. v. United States*, 654 F.2d 81 (Ct. Cl. 1981), where the court disapproved of the administrative procedures in place, is also inapposite because it did not address the adequacy of the agency's fact-finding procedures.

25

**United States District Court**
For the Northern District of California

10.     *Shrode v. Rowoldt*, 213 F.2d 810, 814 (8th Cir. 1954) is inapposite because that court found that the "action [was] not based upon the bond as a contract but [was] a suit in equity . . . ."

11.     The government's argument—that immigration bonds cannot be government contracts because DHS employees do not have authority to enter into the contract on behalf of the government—is premature.  The government may, if it chooses, argue lack of authority as an affirmative defense.

12.     Defendants correctly state that 8 C.F.R. section 103.6(e) allows the DHS to declare a "claim" in favor of the United States.  They then contend that this claim is a breach of contract claim.  In other words, they argue that the declaration is simply an internal administrative hurdle that DHS must comply with before asserting a breach of contract claim against a surety.  This argument is undercut by the existence of the regulatory scheme, which provides for motions to reconsider, motions to reopen and an appellate procedure.  In other words, the regulatory scheme and the attendant administrative record demonstrate that the bond-breach declaration is made on the merits.

13.     Since the standard of review, as determined above, will remain the same whether defendants' counterclaim proceeds under the Little Tucker Act or the APA, the particular jurisdictional hook employed for the counterclaim will likely have no effect upon the resolution of this action.

14.     The district director may also forward the complete A-file to the AAO, though this is not generally done.  *See* Adjudicator's Field Manual Excerpt at 1; Rhew Dec. ¶ 3.  All of defendants' objections to Rhew's declaration based on his purported legal conclusions, and the lack of his personal knowledge or foundation are overruled.  The hearsay objections to Rhew's statements, which are based on his personal knowledge and do not implicate hearsay within hearsay, are also overruled.  The Adjudicator's Field Manual Excerpt was properly authenticated based on personal knowledge and is admissible under the public records and reports hearsay exception.  *See* Fed. R. Evid. 803(8).