**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8    UNITED STATES OF AMERICA,                    No. C-09-4029 EMC

9              Plaintiff,

10        v.                                **ORDER RE MOTIONS FOR SUMMARY**
                                            **JUDGMENT**
11   GONZALES & GONZALES BONDS AND
     INSURANCE AGENCY, INC., *et al.*,

12                                          **(Docket Nos. 156, 159, 163, 165, 167, 169,**
               Defendants.                  **171, 174, 176, 182, 242)**
13   _____/

14

15

16        Plaintiff the United States initiated this lawsuit against Defendants Gonzales & Gonzales

17   Bonds and Insurance Agency, Inc. and American Surety Company (collectively, "G&G").  The

18   lawsuit concerns contracts entered into by the government and G&G.  More specifically, G&G

19   posted immigration bonds with the government (on behalf of certain aliens), and, according to the

20   government, G&G substantially violated the conditions of those bonds, for example, by failing to

21   deliver an alien to the government upon demand.  The government thus seeks to recover the bond

22   amounts from G&G.  G&G, in turn, contends that any bond breach declared by the government

23   should be rescinded or that the bond itself should be deemed invalid because the government first

24   breached the bond agreements, for example, by failing to issue a timely delivery demand.

25   Accordingly, G&G contends it owes nothing to the government.

26        Currently pending before the Court are multiple summary judgment motions and cross-

27   motions regarding twenty different bond matters.  The twenty bond matters were identified by the

28   parties as bellwether cases.  Subsequently, the parties identified ten out of the twenty bond matters

**United States District Court**
For the Northern District of California

that the Court could evaluate as an initial matter, with the understanding that the Court's ruling on these ten matters would help resolve the remaining bellwether cases, as well as all other bond matters at issue in this action. The ten bond matters identified by the parties are with respect to the following aliens:

(1)     Jose Velasquez-Ortega;

(2)     Francisco Ayala-Sanchez;

(3)     Jose Rodriguez-Yanez;

(4)     So Mi Lee;

(5)     Yi Chun Yeh;

(6)     Martin Nicholas Antonio;

(7)     Ingrid Maricela Cruz-Palacios;

(8)     Leonel Antonio Recinos-Flores;

(9)     Sandeep Singh; and

(10)    Miguel Antonio Ortega-Sagbay.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** summary judgment to G&G on the Velasquez-Ortega, Ayala-Sanchez, Lee, Yeh, Antonio, Cruz-Palacios, Recinos-Flores, and Singh bond matters but **DENIES** G&G summary judgment on the remaining bond matters. The Court **GRANTS** the government summary judgment on the Rodriguez-Yanez and Ortega-Sagbay bond matters but **DENIES** the government summary judgment on the remaining bond matters.[1]

As to the issue of interest, costs, and penalties, the Court finds in favor of the government on interest and costs. With respect to penalties, the Court finds in favor of the government in part and in favor of G&G in part. More specifically, the government did not abuse its discretion in assessing penalties at the outset but, after G&G offered to pay the principal debt (but not accrued interest or

---

[1] At the hearing on the summary judgment motions and cross-motions, the government filed a motion to strike the August 2014 Bonds Handbook from the record. *See* Docket No. 242 (motion). That motion is **DENIED** as moot. G&G did not substantively rely on the Bonds Handbook in support of any of its arguments as to the ten bond matters at issue.

United States District Court

For the Northern District of California

1  penalties), the government abused its discretion in continuing to assess penalties thereafter on the

2  amounts tendered.

3  **I.   GENERAL PRINCIPLES**

4  A.   Standard of Review

5         Previously, the Court ordered a remand to the agency so that, for each bond dispute, the

6  agency could "consider G&G's defenses in the first instance and reach a reasoned decision for this

7  Court to review."  Docket No. 141 (Order at 12).  Subsequently, in accordance with the Court's

8  order, G&G presented its defenses to the agency and a number of the bond disputes were actually

9  resolved.  *See* Docket No. 153 (civil minutes).  However, for the remainder of the bonds, the agency

10  concluded that G&G was in breach and issued decisions to that effect.  Those agency decisions are

11  now the subject of the pending motions for summary judgment.

12         Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the

13  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

14  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating whether summary judgment is

15  appropriate, the Court applies Judge Patel's prior ruling that "[t]he arbitrary and capricious standard

16  [employed under the Administrative Procedure Act ('APA')] is . . . appropriate for review of the

17  government's bond-breach determinations."  *United States v. Gonzales & Gonzales Bonds & Ins.*

18  *Agency, Inc.*, 728 F. Supp. 2d 1077, 1082 (N.D. Cal. 2010) (rejecting G&G's contention that de

19  novo review is appropriate).

20         Although Judge Patel referred specifically to the arbitrary-and-capricious component of the

21  APA, she did not foreclose de novo review where appropriate under the APA – *e.g.*, for purely legal

22  issues.  *See Howard v. FAA*, 17 F.3d 1213, 1215 (9th Cir. 1994) (noting that, under the APA,

23  "[p]urely legal questions are reviewed de novo"); *see also* 5 U.S.C. § 706 (providing that "the

24  reviewing court shall decide all relevant questions of law"); *Dubois v. United States Dep't of Agric.*,

25  102 F.3d 1273, 1284 (1st Cir. 1996) (stating that, under the APA, "[e]rrors of law are reviewed by

26  the court *de novo*").  That being said, Judge Patel did not explicitly address whether contract

27

28

United States District Court

For the Northern District of California

interpretation is considered a purely legal issue for which there is de novo review under the APA.[2] Contract interpretation, of course, is typically deemed a question of law. Nevertheless, several courts have held that, where an agency's action is being challenged pursuant to the APA, and where the agency has interpreted a contract, that interpretation is entitled to deference and the arbitrary-and-capricious standard applies – at least where the agency's expertise or statutory domain is implicated.

For example, in *Muratore v. United States OPM*, 222 F.3d 918 (11th Cir. 2000), the Eleventh Circuit so concluded. It explained that the arbitrary-and-capricious standard was appropriate by drawing an analogy to *Chevron* deference: "*Chevron* stands, in part, for the proposition that courts may not always conduct a de novo review of agencies even on the pure question of law of *statutory* interpretation" – *i.e.*, "the 'question for the court is whether the agency's answer is premised on a permissible construction of the statute.'" *Id.* at 921 (emphasis added). "'*[C]ontract* interpretation . . . is sufficiently similar to statutory interpretation [that it] warrants deference – especially when the interpretation involves a policy determination within the agency's statutory domain.'" *Id.* at 922 (emphasis added). In *Muratore* itself, the Eleventh Circuit concluded that, because of the agency's expertise, it would defer to the agency's contract "interpretation so long as that interpretation is reasonable and relies on ample factual and legal support." *Id.*

Other courts have adopted the same or a similar approach. For example, the Tenth Circuit has stated that "an agency's interpretation of a contract is reviewed under the arbitrary and capricious standard when the subject matter of the contract involves the agency's specialized expertise." *Sternberg v. Sec'y*, 299 F.3d 1201, 1205 (10th Cir. 2002). Similarly, in *National Fuel Gas Supply Corp. v. Federal Energy Regulatory Commission*, 811 F.2d 1563 (D.C. Cir. 1987), the D.C. Circuit stated that "an agency's reading of a settlement agreement" should be given deference, "even where the issue simply involves the proper construction of language," because the agency's statutory domain had been implicated. *Id.* at 1569. And in *Harrell & Owens Farm v. Federal Crop Insurance Corp.*, No. 4:09-CV-217-FL, 2010 U.S. Dist. LEXIS 145422 (E.D.N.C. Oct. 6, 2010), a

---

[2] Some, but not all, of the issues before the Court involve contract interpretation.

1    district court acknowledged that there were seemingly conflicting Fourth Circuit cases as to which

2    standard should apply (arbitrary and capricious or de novo) but, ultimately, declined to resolve the

3    conflict because

> [t]here is sufficient common teaching in the cases to provide a
> framework for the court to decide the instant matter.  Specifically, the
> cases agree that where the agency's interpretation turns on reference to
> rules and regulatory provisions, is made pursuant to a comprehensive
> statutory scheme, and is based on specific policymaking prerogatives
> and subject-specific expertise, the court is to afford the agency
> substantial deference.  By contrast, where the agency's determination
> was made simply by reference to general common law principles
> governing contracts, no such deference is given.

*Id.* at *21; *see also Dayton Power & Light Co. v. Fed. Energy Reg. Comm'n*, 843 F.2d 947, 953 (6th

Cir. 1988) (stating that "'[a]n agency's interpretation of a contract . . . may be reviewed by a court

without special deference,'" at least where the interpretation is not based on any factual findings or

technical expertise).

     Cases contrary to those cited above appear to be much fewer in number.  *See, e.g.*, *Muratore*,

222 F.3d at 921 (noting that "[t]he Fifth Circuit has continued to conduct a de novo review in its

recent cases"); *Wapato Heritage, LLC v. United States*, No. CV-08-177-RHW, 2008 U.S. Dist.

LEXIS 117185, at *14 (E.D. Wash. Nov. 21, 2008) (acknowledging that the agreement involved

"subject matter clearly within the [agency's] specialized expertise" but still applying de novo

review).

     The Court agrees with the reasoning of the Eleventh Circuit in *Muratore*.  As a general

matter, the Court finds that, here, the agency's specialized expertise and statutory domain have been

sufficiently implicated with respect to the contracts at issue, namely, the immigration bonds and the

parties' prior settlement agreements which address how the parties should deal with immigration

bonds.  Thus, even where the agency is interpreting an immigration bond or one of the parties' prior

settlement agreements, the Court applies the arbitrary-and-capricious standard.

B.     <u>Contracts at Issue</u>

     As indicated above, the parties entered into several contracts which are relevant for purposes

of this litigation.  First, there are the immigration bonds for the various bond matters.  Second, the

parties previously entered into two settlement agreements, known as Amwest I and Amwest II.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Amwest I was entered into before the effective date of the Illegal Immigration Reform and

2    Immigrant Responsibility Act ("IIRIRA").[3]  Amwest II was entered into after the effective date of

3    the IIRIRA.

4         At the hearing, the Court noted that, based on its evaluation of the immigration bonds and the

5    Amwest agreements, there was no conflict between the two.  For example, the bonds provide that

6    they will be automatically cancelled for certain reasons, *see, e.g.*, Docket No. 156-9 (Ex. B at 961)

7    (general terms and conditions for 1997 version of immigration bond), but they do not preclude

8    cancellation for other reasons, including but not limited to those contemplated by the Amwest

9    agreements.  Neither party disagreed with this general assessment of the contracts.

10        As to the Amwest agreements specifically, the Court also indicated at the hearing that it

11   found the "Policy Statements" attached to Amwest I and the "INS field memo" attached to Amwest

12   II to be part of the binding contract between the parties.  Neither party challenged the Court's

13   assessment of the Policy Statements.  Nor could they legitimately do so, given the clear language of

14   Amwest I, which states: "The attached policy statements are binding on the parties in their

15   contractual relationship formed through the execution of any immigration bond contract, whether in

16   the past or in the future, using the bond agreement (INS Form I-352) attached to this Agreement as

17   Exhibit K."[4]  Docket No. 156-3 (Ex. B at 33) (Amwest I ¶ 2).

18        However, with respect to the INS field memo, here, the government did argue that it is not

19   binding on the parties.  The Court finds the government's position without merit.  Notably, the

20   government itself relied on the INS field memo to support its case, at least on certain issues.  The

21   government cannot selectively rely on the INS field memo where it is convenient to do so but

22   disavow the memo where it is inconvenient.  Moreover, the language of Amwest II and the INS field

23

24   ───────────────

25        [3] IIRIRA became effective on April 1, 1997.

26        [4] To the extent the government argued in its papers that the Amwest agreements apply only
     when the 1984 version of the immigration bond form is used (and not, *e.g.*, the 1997 or 1999
27   versions), the Court rejects that argument.  It would make no sense for the parties to believe that the
     exact version of the immigration bond form would be controlling on the application of the settlement
28   agreements, especially when it would likely be anticipated that the I-352 form would change over
     the years.

United States District Court

For the Northern District of California

memo clearly establishes that the memo is a binding part of the settlement.  Under Amwest II, the parties agreed that the government would

> immediately send the INS Field Memorandum ("INS field memo") in a format substantially similar (i.e. with no material changes unless mutually agreed to by the Parties) to the document attached hereto as Exhibit "A" to all District Directors and District Deportation Directors throughout the United States, and to the AAU.

Docket No. 156-4 (Ex. B at 60) (Amwest II ¶ 1).  The INS field memo itself states that its purpose is to "provide comprehensive guidance for the implementation of the subject Settlement."  Docket No. 156-4 (Ex. B at 65) (INS field memo attached to Amwest II).  Thus, taken together, the government cannot reasonably argue that the INS field memo does not impose obligations on the government as part of the settlement agreement.[5]

The government protests still that the INS field memo should be given no effect because it was not signed and was stamped "DRAFT."  This argument is unavailing.  The fact that the memo was not signed is irrelevant because the settlement agreement itself (Amwest II), to which the field memo was attached, was signed.  Similarly, the fact that the memo was stamped "DRAFT" is insignificant because Amwest II stated that there would be no material change to the memo unless the parties mutually agreed to the change.  Despite its "DRAFT" denomination, it was made part of the Amwest II settlement agreement.

Accordingly, in evaluating the alleged bond breaches, the Court shall give force to not only the immigration bonds themselves but also both Amwest I and II, including the attached Policy Statements and INS field memo.

C.    Materiality of a Breach

Finally, at the hearing, the Court took note that, as a general matter, unless a contract provides a specific remedy for a breach (there are certain breaches that are so treated), a breach in and of itself does not automatically give the nonbreaching party a remedy – or, for that mater, an excuse not to perform its obligations under the contract.  Rather, under traditional contract law, there must first be a material breach before the nonbreaching party is entitled to a remedy and/or an

---

[5] While the government had the authority to alter the INS field memo from Exhibit A, it was not permitted under the settlement agreement to make any material changes.

United States District Court
For the Northern District of California

excuse for nonperformance.  *See, e.g.*, *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550-51 (Fed. Cir. 1992) (noting that "[n]ot every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement, thereby allowing the nonbreaching party to cease its performance and seek appropriate remedy"; adding that "[t]he standard of materiality for the purposes of deciding whether a contract was breached 'is necessarily imprecise and flexible'" and "[t]he determination depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties"); *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1074 (7th Cir. 2004) (taking note of "the general principle of contract law that breaches that are technical, harmless, and therefore 'immaterial' do not allow the 'victim' of the breach to walk away from the contract to the great harm of the party that committed the harmless breach"); *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed. Appx. 665, 671 (9th Cir. 2010) (stating that "'[a] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract'").  Neither party took issue with this general principle.

## II.  **DISCUSSION**

Based on the Court's review of the summary judgment motions and cross-motions, it makes sense to address the motions issue-by-issue rather than bond-by-bond.  There are ten substantive issues that the Court has identified.  Also, assuming that the Court will rule in the government's favor on any bond matter, then it will also have to evaluate whether interest, costs, and penalties were properly assessed against G&G.

A.    Delivery Demand Within Ninety-Day Removal Period

As explained in one of the agency decisions below,

> [i]n general, aliens placed in removal proceedings are subject to a custody determination and some classes of aliens may be released from detention under certain conditions, including the execution of an immigration bond.[6]  Immigration bonds are executed between ICE and the bond obligors – the surety company and its agent. Immigration delivery bonds are similar to bail bonds, and provide for

---

[6] *See, e.g.*, 8 U.S.C. § 1226(a)(2) (providing that "an alien may be arrested and detained pending a decision on whether the alien is to be removed" and that the Attorney General "may release the alien" on a bond of at least $1,500).

**United States District Court**
For the Northern District of California

the release of an alien until the removal proceedings are terminated; the alien has been accepted by DHS for detention, deportation or removal; or the bond is otherwise cancelled. These bonds are underwritten by a surety company certified by the Department of Treasury to post bonds on behalf of the Federal government. . . .

ICE requests the surrender of an alien pursuant to the terms of a delivery bond by sending a demand notice (Form I-340) to the obligor designating the date, time, and place for the alien to appear. If the obligor fails to deliver the alien as requested, ICE may declare the bond breached, and notifies the obligors of that informal administrative decision by issuing a breach notice (Form I-323).

Docket No. 156-1 (Ex. A at 1-2) (agency decision) (emphasis added).

According to G&G, under the Amwest agreements, the agency was obligated to issue a delivery demand for an alien within the ninety-day removal period provided for by the IIRIRA. *See* 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')."). Because, in multiple bond matters, the agency did not issue a delivery demand to G&G until well after the ninety days had expired (in some cases, not until years later), G&G contends that these bonds should be deemed cancelled.

In evaluating G&G's argument, the Court begins first with the Amwest agreements, as this is the source of the alleged contractual obligation to provide a delivery demand within ninety days. In Amwest I, the parties agreed that the government would follow what was known as the *Shrode* rule. The *Shrode* rule came from an Eighth Circuit opinion, *Shrode v. Rowoldt*, 213 F.2d 810 (8th Cir. 1954).

In *Shrode*, the alien posted a delivery bond. Subsequently, he was ordered deported. More than six months after the deportation order, the alien was placed on supervisory parole. The alien demanded that the delivery bond previously posted be released because "so long as the bond remains in full force and effect and uncancelled he [was] required to pay premiums to his surety and [was] unable to receive back from the surety the deposit made by him on the execution of the bond." *Id.*

The Eighth Circuit found in favor of the alien. It began by taking note of the immigration statute in place at the time, which provided that "'[a]ny alien, against whom an order of deportation, heretofore or hereafter issued, has been outstanding for more than six months shall, pending

United States District Court

For the Northern District of California

eventual deportation, be subject to supervision under regulations prescribed by the Attorney General.'" *Id.* at 812.  The Eighth Circuit held that, under this statute, "the Attorney General is given six months after the entry of an order of deportation within which to effect deportation and *during that period* plaintiff was properly required to post and keep posted his [delivery] bond." *Id.* at 812 (emphasis added).  But after these six months, the alien was subject to supervision only, and the supervision regulations prescribed by the Attorney General "'make no provision either for detention, for release under bond, or for the continuance of bonds previously posted.'" *Id.* at 813.

The court continued:

> After six months from the entry of the order of deportation the Attorney General has *only the power of supervision.  He may not detain, he may not imprison, and hence, it is illogical to hold that he may nevertheless require the posting of bail.*  When a party is required to post bail his sureties in effect become his jailers and the power to require bail connotes the power to imprison in the absence of such bail.

*Id.* at 813-14 (emphasis added).  In short, the Eighth Circuit held that the predicate for a valid bond is the authority of the government to detain.  If the government no longer has the authority to detain, then a bond can no longer be deemed valid.

While at the time of *Shrode*, the period within which the government was required to deport the alien was six months, the enactment of the IIRIRA shortened that period – now known as the removal period – to ninety days.  G&G acknowledges this change in timing but argues that, nevertheless, the reasoning underlying *Shrode* is still valid.  That is, based on *Shrode*, G&G contends that, because the government had the authority to detain an alien only within the ninety-day removal period, it had to issue its delivery demand within that window under the rationale of *Shrode*.  Once past the ninety days, the government's authority to detain the alien ordered to be removed expired, and therefore so did the bond.

The government does not seriously dispute that, under Amwest I, it agreed to follow the *Shrode* rule.  *See* Docket No. 156-3 (Ex. B at 41) (Amwest I, Ex. A) (stating that, "'[u]pon the expiration of the sixth month period following the date an order of deportation becomes final for detention purpose, the alien, as a rule, cannot be taken or continued in physical custody, released or released or continued on bond or on his own recognizance'" and so "[a]ny outstanding bond or order

United States District Court

For the Northern District of California

1   of recognizance must be cancelled'") (emphasis in original).  The government asserts, however, that

2   Amwest I was entered into prior to the IIRIRA and, with Amwest II, which was entered into post-

3   IIRIRA, it no longer agreed to abide by the *Shrode* rule, at least for proceedings initiated on or after

4   the act's effective date.[7]

5        The Court finds the government's position untenable.  The INS field memo attached to

6   Amwest II expressly addressed the *Shrode* rule:

> The crux of this rule is that since the Attorney General's statutory
> authority (8 U.S.C. 1252(c) at that time) to detain aliens under a final
> order of deportation expires 180 days after the date of the order, INS
> has no authority to maintain a delivery bond on the alien after that
> period expires.  Therefore any such bond on which INS has not issued
> a demand setting a date to surrender for deportation which is within
> the 180 day period *is null and void as a matter of law.* . . . [T]he
> Settlement requires that any Office faced with this kind of fact
> situation rescind the breach and cancel the bond. . . .

12  Docket No. 156-4 (Ex. B at 67) (Amwest II, Ex. A) (INS field memo) (emphasis added).

13       The memo acknowledged that, since Amwest I, the IIRIRA had been enacted and become

14  effective, but it also noted that the impact the statute had on the *Shrode* rule was limited: For

15  proceedings initiated on or after the IIRIRA's effective date,

> Section 241 of the Immigration and Nationality Act requires removal
> within the removal period (i.e., 90 days from either the date of a final
> order, or of the alien's release from detention by another law
> enforcement agency).  It also authorizes detention after that period in
> certain circumstances.  *Absent one of those circumstances, however,
> the Attorney General's authority to detain expires.*  Thus, all Offices
> must be extremely careful in cases where INS fails to remove an alien
> within the removal period, for *if the Attorney General's authority to
> detain expires (i.e., none of the circumstances allowing detention after
> that period apply), the principle underlying the* Shrode *Rule applies,
> and INS must cancel any existing delivery bond*.  This situation should
> never arise once the mandatory detention provisions (during the 90
> days) become effective, since taking the alien into custody will require
> cancellation of any delivery bond.

24  Docket No. 156-5 (Ex. B at 68) (Amwest II, Ex. A) (INS field memo) (emphasis added).

25       Thus, even in Amwest II, the government endorsed the basic principle underlying *Shrode*.

26  The validity of the bond is coextensive with its authority to detain an alien subject to removal.  To

27  _____

28       [7] There is no dispute that the bond matters at issue here all post-date the IIRIRA.

United States District Court

For the Northern District of California

the extent the government claims the INS field memo simply speculates as to how *Shrode* might

apply post-IIRIRA, *see* Mot. at 4, that position cannot be squared with the clear language quoted

above.

The government's argument that the *Shrode* rule no longer has validity under the IIRIRA is

equally unavailing for several reasons.  First, even if the *Shrode* rule were technically rendered

obsolete by the IIRIRA with the change in the detention period, the fact remains that the government

agreed – as a part of Amwest II, which was entered into *post*-IIRIRA – that it would abide by the

*Shrode* rule with respect to its dealings with G&G.[8]

Second, the Court does not agree with the government that the basic *Shrode* principle no

longer has validity in the wake of the IIRIRA.  The IIRIRA, undoubtedly, does implement some

changes to the *Shrode* scheme.  For example, under the IIRIRA, the government's authority to detain

can, in certain circumstances, be extended beyond the removal period of ninety days.[9]  For example,

under 8 U.S.C. § 1231(a)(1)(C),

> [t]he removal period shall be extended beyond a period of 90 days and
> the alien may remain in detention during such extended period if the
> alien fails or refuses to make timely application in good faith for travel
> or other documents necessary to the alien's departure or conspires or
> acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231(a)(1)(C).  Also, under § 1231(a)(6),

> [a]n alien ordered removed who is inadmissible under section 212 [8
> U.S.C. § 1182], removable under section 237(a)(1)(C), 237(a)(2), or
> 237(a)(4) [8 U.S.C. § 1227(a)(1)(C), (a)(2), or (a)(4)] or who has been
> determined by the Attorney General to be a risk to the community or
> unlikely to comply with the order of removal, may be detained beyond
> the removal period and, if released, shall be subject to the terms of

---

[8] The government's reliance on *Safety National Casualty Corp. v. United States Department of Homeland Security*, 711 F. Supp. 2d 697 (S.D. Tex. 2008), and *AAA Bonding Agency Inc. v. United States Department of Homeland Security*, 447 Fed. Appx. 603 (5th Cir. 2011) (affirming *Safety National*), is unavailing in part because the Amwest agreements were not applicable in those cases.  *See, e.g.*, *Safety Nat'l*, 711 F. Supp. 2d at 715.

[9] Because the authority to detain can extend beyond ninety days, it is not surprising that the immigration bonds contain language referring to a breach notice (I-323) being sent beyond 180 days with the bond still being valid.  *See, e.g.*, Docket No. 156-9 (Ex. B at 961) (general terms and conditions for the 1997 version of the immigration bond) (providing that "[f]ailure to send an I-323 within 180 days shall have no effect on the status of the bond; i.e., the bond shall remain in full force until and unless properly canceled").

United States District Court

For the Northern District of California

1   supervision in paragraph (3) [which addresses supervision after the
2   ninety-day removal period].

3   *Id.* § 1231(a)(6).  But an extension of the government's authority to detain is not inconsistent with

4   the *Shrode* rule; rather, the only effect is that, where the government's authority to detain is

5   extended, the validity of the bond continues during that time and, therefore, a delivery demand

6   issued during that time would also be valid.[10]  The basic principle in *Shrode* that the validity of the

7   bond is coextensive with the government's authority to detain remains applicable here.

8       Both in its papers and at the hearing, the government focused on a regulation enacted post-

9   IIRIRA, asserting that this regulation undercuts the *Shrode* rule.  The Court is not persuaded.  The

10  regulation on which the government relies is 8 C.F.R. § 241.5, which provides in relevant part as

11  follows: "An officer authorized to issue an order of supervision may require the posting of a bond in

12  an amount determined by the officer to be sufficient to ensure compliance with the conditions of the

13  order, including surrender for removal."  8 C.F.R. § 241.5(b).

14      Admittedly, in *Shrode*, the Eighth Circuit noted that, after the six-month deportation period

15  was over, an alien was subject only to supervision, and the supervision regulations prescribed by the

16  Attorney General "'make no provision either for detention, for release under bond, or for the

17  continuance of bonds previously posted.'"  *Shrode*, 213 F.2d at 813.  Now, with § 241.5, the

18  Attorney General has, in the supervision regulations, made provision for release under bond.  In this

19  respect, things are different since *Shrode*.  But at the end of the day, § 241.5 simply gives the

20  government the authority to issue a *supervision* bond; it does not allow for "'continuance of [a

21  delivery] bond[] previously posted,'" *id.*, nor does it permit conversion of such a bond into a

22  supervision bond.[11]  *See e.g.*, Docket No. 209-1 (Nye Decl., Ex. 10) (internal ICE memo, dated April

---

23

24      [10] Notably, at the hearing, the government expressly disavowed that, with respect to the bond
matters at issue, it had the authority to issue a delivery demand outside of the ninety days because its
authority to detain had been extended pursuant to, *e.g.*, § 1231(a)(6).  The Court therefore expresses
25  no opinion as to whether the government could have issued a delivery demand beyond the ninety-
day removal period because of an extension to that period.
26

27      [11] The district court in *Safety National Casualty Corp. v. United States Department of
Homeland Security*, 711 F. Supp. 2d 697 (S.D. Tex. 2008), failed to take this point into account in its
28  analysis.  *See id.* at 720 (stating that § 1231 "has been interpreted to allow the Agency to condition a
post-removal-order immigrant's release from detention upon the posting of a bond" which

United States District Court
For the Northern District of California

8, 2008) (stating that "[t]here is no conversion of a delivery bond into an OSUP [order-of-supervision] bond[;] a deliver[y] bond must be cancelled and an OSUP Bond must be posted in lieu of the delivery bond or the delivery bond may be left in place and an OSUP bond may be posted"). There is a clear difference between a delivery bond and a supervision bond, as discussed, *infra*. *See* Part III. F, *infra*.

The government disputes that § 241.5 refers only to a supervision bond, noting, *e.g.*, that the regulation makes reference to "a" bond without specifying any specific kind of bond. But this argument flies in the face of the plain language of the regulation. Subsection (a) is titled "Order of supervision" and subsection (b) is titled "Posting of bond." Section 241.5 allows for a bond only in conjunction with an order of supervision. Thus, for the government to argue that any kind of bond – and not just a supervision bond – is allowed under the regulation is patently unreasonable.

The government's reliance on *Doan v. INS*, 311 F.3d 1160 (9th Cir. 2002), is misplaced. There, the Ninth Circuit addressed a supervision bond and held that, "[a]lthough the statute authorizing terms of supervision, 8 U.S.C. § 1231(a)(3) and (6), does not expressly authorize a bond, it does not exclude such a condition." *Id.* at 1161. While the *Doan* court did mention *Shrode*, it simply noted that it was "decided before the Attorney General promulgated regulations authorizing a bond." *Id.* at 1162. The Ninth Circuit did not disavow the basic principle underlying *Shrode* – *i.e.*, that the validity of a delivery bond is dependent upon the government's authority to detain. As discussed above, § 241.5 is at most a source of authority to issue a supervision bond; it has nothing to do with a delivery bond. *Doan* does not hold to the contrary. In any event, the parties are bound by Amwest II which was not involved in *Doan*.

Accordingly, the Court concludes that, even under the arbitrary-and-capricious standard, G&G is entitled to relief. Under the Amwest agreements, the government agreed that it would apply the *Shrode* rule to G&G, even post-IIRIRA. It was therefore arbitrary and capricious for the agency to conclude (as it did in the agency decisions below) that it was not required to issue a delivery

---

"distinguishes the Eighth Circuit's interpretation [in *Shrode*] of an earlier version of the statute, 8 U.S.C. § 156, and that Circuit's conclusion that the Agency could not require an alien to post bond after the Agency's detention authority expired").

United States District Court

For the Northern District of California

demand within the ninety-day removal period, *i.e.*, during the period that it had the authority to detain.  Nor could the agency reasonably rely on § 241.5 as a source of authority for the delivery bond because, at most, that regulation provides for authority to issue a supervision bond.  The regulation does not provide for continuance of a delivery bond nor conversion of a delivery bond into a supervision bond.  In any event, Amwest II is clear on this point.

B.    Delivery Demand and Three-Day "Waiting Period"

Under the terms of the immigration bonds executed by the parties, the agency was required to send the delivery demand to G&G first and then wait at least three days before notifying the alien of the required surrender – typically, through a Form I-166.  For example, the bonds provided: "No demand to produce the bonded alien for deportation/removal shall be sent less than three days prior to sending notice to the bonded alien."  Docket No. 156-9 (Ex. B at 961) (general terms and conditions for 1997 version of immigration bond).

The three-day waiting period was required by not only the immigration bond but also by the Amwest agreements.  Amwest I provides: "INS agrees that if INS intends to notify the alien of the date and time of deportation, such notice will not be mailed to the alien before, and not less than three days after, the demand to produce the alien is mailed to the bond obligor."  Docket No. 156-3 (Ex. B at 35) (Amwest I ¶ 6).  Similarly, Amwest II provides:

> Paragraph 6 of the Settlement requires that INS send notice of a surrender date and time for deportation/removal to obligors at least three days in advance of sending such notice to the bonded alien. . . . Failure to do so will render any attempt to breach the bond for failure to surrender that date null and void.  Failure to give the obligor the requisite notice will entitle it to rescission of any breach.  It will not affect the status of the bond itself, however, and INS may (assuming no intervening event requires cancellation) issue another demand.

Docket No. 156-4 (Ex. B at 69) (Amwest II, Ex. A) (INS field memo).

According to G&G, if the agency failed to comply with the three-day waiting period – *e.g.*, if it had sent the delivery demand to G&G and the I-166 notice to the alien on the same day – then the agency could not thereafter send a second delivery demand.  G&G explains that the purpose of the three-day waiting period is, in essence, to give the surety a chance to get to the alien before the alien is put on notice of the impending removal and "runs."  (Thus, G&G calls the I-166 notice sent to the

United States District Court

For the Northern District of California

1    alien a "run" letter.)  Giving the government a second chance to issue a delivery demand makes no

2    sense because the alien has already been put on notice of the need to run.

3         In support of its position, G&G relies on *Safety National* and the appeal taken to the Fifth

4    Circuit (*AAA Bonding*) – ironically, the same cases that the government relied on with respect to the

5    *Shrode* rule.  In *Safety National*, the Texas district court addressed the issue of a second delivery

6    demand as follows:

> In addition to sending an I-340 notice demanding delivery of
> an alien to the bonding companies, DHS also sends notice of the
> delivery date to the alien.  According to Plaintiffs, this form is
> also referred to as a "run letter" because it creates a risk that the alien will
> leave town before the delivery or deportation date.  The I-352 Bond
> Contract appears to acknowledge this risk, stating [in its general terms
> and conditions] that "no demand to produce the bonded alien for
> deportation/removal shall be sent less than three days prior to sending
> notice to the bonded alien."  This statement is not included in the list
> of events that automatically cancel a bond.  The Bond Contract also
> clearly states, however, that a delivery bond is breached when the
> obligor fails to produce the alien in response to "a *timely* demand."
> The Court looks to the language of the contract as a whole to
> determine the meaning of "timely." . . . [T]he Bond Contract itself
> states unequivocally that no demand to produce an alien will be sent
> less than three days prior to sending notice to the alien.  Under the
> clear language of the bond, where the agency fails to do so, it has not
> made a timely demand, and the bond has not been breached.

17   *Safety Nat'l*, 711 F. Supp. 2d at 725-26 (emphasis in original).

18        In a follow-up decision, the district court reiterated that "[a] bond is not breached unless

19   DHS sends an I-340 Notice [delivery demand] at least three days prior to sending the Run Letter"

20   and further held that, "[o]nce a Run Letter is sent, the bell is rung and unless DHS sent the I-340

21   notice at least three days before that, *the bond will forever remain unbreached*."  *Safety Nat'l Cas.*

22   *Corp. v. U.S. Dept' of Homeland Sec'y*, No. H-05-cv-2159, 2010 WL 1849037, at *8 (S.D. Tex.

23   May 11, 2009) (emphasis added).  The court added: "[T]his is a defect that can never be corrected."

24   *Id.*

25        On appeal to the Fifth Circuit, DHS argued, *inter alia*, that the district court's holding was

26   not consistent with the bond agreement which expressly allowed the agency to *reissue* a breach

27   notice.  *See AAA Bonding*, 447 Fed. App. at 610.  The Fifth Circuit disagreed: "An untimely run

28

United States District Court

For the Northern District of California

1   letter is a clear violation of the terms of the bond agreement, the consequences of which cannot be

2   'undone' by the passage of time." *Id.* at 611.

3       G&G's position is thus supported by both *Safety National* and *AAA Bonding*.  And notably,

4   the bond agreement at issue in those cases seemed to have the same or similar provisions as the bond

5   agreements here – *e.g.*, (1) the provision containing the three-day waiting period, (2) the provision

6   that a delivery bond is breached only where there is first a *timely* demand and thereafter a failure to

7   produce the alien, and (3) the provision that, "[i]n the case of a delivery bond, INS may, unless

8   otherwise precluded by law, send a *new* timely demand to produce the alien and then breach the

9   bond again if the obligor fails to produce the alien."  Docket No. 156-9 (Ex. B at 966) (general terms

10  and conditions for 1999 version of immigration bond).

11      That being said, the analysis in those two opinions is problematic.  At bottom, what the

12  courts in *Safety National* and *AAA Bonding* were being called upon to do was contract interpretation

13  – *i.e.*, what did the parties intend?  If all that the courts were looking at was provision (1) and (2)

14  above, then the reasoning in the opinions would make sense – *i.e.*, giving the government a second

15  chance at issuing a delivery demand would not be fair to the surety because, by that time, the alien

16  had already been given notice of the need to run.  But provision (3) above seems to be in conflict

17  with this reasoning; on its face, the provision contemplates that the government has the right to send

18  a second delivery demand.

19      In any event, *Safety National* and *AAA Bonding* are not dispositive because, in those cases,

20  the Amwest agreements were not applicable as they are here.  As noted above, in Amwest II, the

21  INS field memo attached as Exhibit A includes the following statement:

22          Paragraph 6 of the Settlement requires that INS send notice of a
            surrender date and time for deportation/removal to obligors at least
23          three days in advance of sending such notice to the bonded alien. . . .
            Failure to do so will render any attempt to breach the bond for failure
24          to surrender that date null and void.  Failure to give the obligor the
            requisite notice will entitle it to rescission of any breach.  *It will not
25          affect the status of the bond itself, however, and INS may (assuming no
            intervening event requires cancellation) issue another demand.*

26

27  Docket No. 156-4 (Ex. B at 69) (Amwest II, Ex. A) (INS field memo) (emphasis added).  G&G's

28  position cannot be squared with the plain language of Amwest II.  Just as the government is bound

United States District Court

For the Northern District of California

1  by Amwest II as to the validity of the bond for ninety days, G&G is bound by Amwest II as to the

2  ability of the government to issue another demand.  The agency's interpretation of the contracts to

3  allow for a second delivery demand is not arbitrary and capricious.

4  C.    Correct Address for Alien

5        In several of the bond matters, G&G seeks relief on the ground that the agency failed to

6  provide it with the correct address information for the alien (*e.g.*, by not including the apartment

7  number for the alien's address).  The agency's obligation to provide G&G with information about an

8  alien, including his or her address, arises from the Amwest agreements.  In Amwest II, the agency

9  agreed that, at the time it would the delivery demand to G&G, it would also provide G&G with a

10  "Questionnaire."  *See* Docket No. 156-4 (Ex. B at 62) (Amwest II ¶ 5) ( "INS agrees to send [G&G]

11  the Questionnaire (attached to the INS Field Memo as Exhibit 'D') at the time of the sending of the

12  I-340 [the delivery demand].").  The Questionnaire is an information sheet for the benefit of G&G –

13  *i.e.*, to help it locate the alien.  One piece of information to be provided with the Questionnaire is the

14  alien's address.

15        Here, the problem for G&G is that, even if the government did breach Amwest II by failing

16  to provide the correct address information (and the Court only assumes such for purposes of this

17  opinion), a breach in and of itself does not automatically entitle G&G to any relief or excuse G&G

18  from performing its obligations under the immigration bond.  Neither the bond nor the Amwest

19  agreement state that the bond is contractually cancelled in the event of such a breach.  Rather, as

20  noted above, under generally applicable contract law, there must first be a material breach; the

21  breach must cause some injury, prejudice or disadvantage to G&G.  G&G has not pointed to any

22  evidence suggesting that it was not able to deliver an alien because of an alleged incorrect address.

23  Accordingly, the agency's decision not to grant relief was not arbitrary or capricious.

24  D.    Correct Reason for Delivery Demand

25        In several of the bond matters, G&G seeks relief on the ground that the agency failed to

26  identify the correct reason for its issuance of the delivery demand.  The agency's obligation to

27  provide G&G with information about the reason for the delivery demand arises from the Amwest

28  agreements.  In Amwest I, the parties agreed that the I-340 delivery demand that DHS would sent to

**United States District Court**
For the Northern District of California

G&G "must notify the obligor of the date, time, and place he is to surrender the alien. It should also include the *reason* for which the alien is to be presented." Docket No. 193-3 (Ex. B at 41) (Amwest I, Ex. G) (emphasis added). On the latter requirement, the following "clarification" was added:

> If a demand to the obligor to produce an alien (INS Form I-340) does not state the correct reason for which the alien is to be produced (e.g. the demand is to produce the alien for an interview when, in fact, the purpose is to have the alien produced for deportation, and vice versa), then the demand shall be null and void with respect to invoking the bond, and no breach may be declared if the alien fails to appear as demanded.

Docket No. 193-3 (Ex. B at 41) (Amwest I, Ex. G).

In Amwest II, the above agreement was acknowledged by the parties as follows:

> INS also agreed that an I-340 which did not state the correct purpose for which INS was making the demand (e.g., the demand stated that the purpose was deportation when it was really an interview), was legally insufficient to support a breach regardless of whether the surety produced the alien. If INS does breach a bond containing an incorrect statement of purpose, the surety is entitled to a rescission of that breach. Once again, however, the bond itself remains in full force and effect unless some other event requires cancellation.

Docket No. 193-4 (Ex. B at 65) (Amwest II, Ex. A) (INS field memo). As indicated by this language in Amwest II, this is a situation where G&G would not need to show the materiality of a breach in order to obtain relief. Rather, the settlement agreement on its face specifies what remedy is available to G&G should there be a breach of the agreement to provide the correct reason for the delivery demand. The remedy would be rescission of the breach determination.

      1.   <u>Cruz-Palacios</u>

For the Cruz-Palacios bond matter, DHS's delivery demand stated that its purpose was "Immigration Matter." It did not further specify what that immigration matter was – *e.g.*, removal, interview, or some other matter. *See* Docket No. 193-3 (Ex. B at 13) (I-340).

According to the government, the agency complied with the Amwest requirements because the I-340 did correctly identify the reason for the delivery demand – an immigration matter. The government argues that G&G is trying to import now a specificity requirement to which the parties never agreed. The government further argues that the purpose behind the requirement was to ensure

1    that the agency was seeking the delivery of the alien for a proper purpose, and nothing here suggests

2    that the agency was seeking the delivery of Ms. Cruz-Palacios for an improper purpose.

3        In response, G&G argues that "[u]nderlying the contractual requirement that DHS state the

4    correct reason for surrender is that DHS provide a *bona fide reason*, not a generic demand for

5    surrender . . . ."  Docket No. 171 (Mot. at 12) (emphasis added).  G&G further asserts that allowing

6    DHS to use a "generic demand for surrender . . . renders [the agency's] agreement to state a correct

7    purpose as illusory."  Docket No. 171 (Mot. at 12).  "For the rule to have any meaning, and for the

8    purpose to be correct, DHS must be specific.  If the purpose [is] to effectuate removal, then listing

9    an 'immigration matter' is inherently misleading and fails to correctly identify the real reason for the

10   delivery demand."  Docket No. 224 (Reply at 6).

11       While the parties agree that the one purpose behind the requirement is to ensure that the

12   government seeks delivery of the alien in good faith, the requirement performs another function as

13   well.  The purpose gives the bonding company an understanding as to why exactly the delivery is

14   being demanded – a fair requirement given that delivery for certain purposes, such as removal,

15   brings with it a heightened risk of flight on the part of the alien.  G&G's handling of the delivery

16   demand and its ability to work with the alien may well be informed by the nature of the delivery

17   demand.

18       Accordingly, the Court concludes that G&G has the stronger position here, even given the

19   arbitrary-and-capricious standard.  The example that the Amwest agreements give as to what is not

20   appropriate conduct by the government (*i.e.*, stating "removal" as the purpose when the real purpose

21   is "interview") is particularly instructive.  This example indicates that G&G should be given enough

22   information to understand why a delivery demand is being made; the phrase "Immigration Matter" is

23   simply too vague to discharge that function.  Allowing the agency to use this phrase would render

24   illusory the requirement that the agency provide the reason for the delivery demand.  If permitted, it

25   could say "Immigration Matter" for every delivery demand.  Of course, the remedy that G&G is

26   entitled to is, as provided by Amwest II, simply rescission of the bond breach.

27

28

United States District Court

For the Northern District of California

20

United States District Court

For the Northern District of California

2.      Ayala-Sanchez

For the Ayala-Sanchez bond matter, the relevant delivery demand stated that its purpose was "interview and case review."  *See* Docket No. 159-4 (Ex. B at 37) (I-340, dated September 12, 2007); *see also* Docket No. 159-1 (Ex. A at 4) (agency decision) (noting that "[t]he demand notice that resulted in a breach determination was dated September 12, 2007").  G&G contends that this cannot in fact have been the correct purpose for the delivery demand, particularly because, by that time, Mr. Ayala-Sanchez had already been ordered removed.  *See* Docket No. 159-4 (Ex. B at 30) (order of immigration judge, dated January 14, 2003); Docket No. 159-4 (Ex. B at 31-32) (BIA decision, dated May 6, 2004).  According to G&G, DHS's claim that it simply wanted to interview and conduct a case review

> is simply not plausible.  DHS's statutory mandate was to remove Mr. Ayala-Sanchez within 90 days of his final order of removal and it had already sent him a notice to surrender for removal.  Under these circumstances, it does not make sense that DHS would seek his surrender again, but this time to only conduct an interview.  Further, Mr. Ayala-Sanchez was subsequently removed from the country.[12] This all points to removal as the reason DHS sought Mr. Ayala-Sanchez's surrender.

> . . . . DHS demands that G&G/ASC prove the reason for surrender was anything other than an interview.  G&G/ASC cannot prove a negative.  The circumstantial evidence described above points to removal as the only conceivable purpose for surrender.  DHS has offered no explanation justifying its stated purpose (i.e. interview) as a legitimate reason to surrender in this case

Docket No. 202 (Opp'n at 10).

The government has the stronger argument.  As it contends, "[t]he upshot of G&G's argument is that, when an alien is subject to an order of removal, the *only* purpose for which DHS can demand delivery is removal."  Docket No. 214 (Reply at 5) (emphasis added).  That is not necessarily true.  ICE might want to conduct a case review or interview an alien subject to removal, *e.g.*, to ascertain whether the necessary travel documents had been obtained.  Moreover, the Court bears in mind that the arbitrary-and-capricious standard is applicable, and the agency articulated a reasonable basis for rejecting G&G's position:

---

[12] Mr. Ayala-Sanchez was removed in June 2009 and then, after he re-entered the United States, again in September 2010.  *See* Mot., Ex. A at 5 (agency decision).

United States District Court
For the Northern District of California

> ICE is authorized to require a bond obligor to surrender an alien at any time to obtain information from the alien about the status of her immigration proceedings.  The Amwest settlement agreements only restrict ICE from issuing a demand notice for an improper purpose, such as for removal when no final order of removal has been entered.  The agreements do not say that ICE is precluded from issuing a demand notice to conduct a case review when the Agency, in its discretion, determines that doing so is the most efficient way to inform itself of the status of the  alien's immigration proceedings.  Indeed, restricting the purposes that ICE may list on the demand notice would unnecessarily interfere with ICE officers' discretion in administering immigration laws.

Docket No. 159-1 (Ex. A at 24) (agency decision).  G&G has made no showing that the stated purpose was in fact false or inaccurate.

       3.    Ortega-Sagbay

For the Ortega-Sagbay bond matter, the delivery demand stated that its purpose was "custody."  *See* Docket No. 198-3 (Ex. B at 8) (I-340) (providing that, "[p]ursuant to the terms of the bond posted by you for the release from custody of the above named alien(s), demand is hereby made upon you to surrender such alien(s) . . . into the custody of an officer of this Service").  At the time of the delivery demand (*i.e.*, November 3, 2004), there was no order of removal that had been issued against the alien.  In fact, two months earlier, the immigration judge ("IJ") presiding over Mr. Ortega-Sagbay's removal proceedings had issued an order administratively closing the case because she was not able to notify Mr. Ortega-Sagbay of the hearing.  Docket No. 198-3 (Ex. B at 7) (IJ order).

G&G's main arguments are that DHS acted arbitrarily and capriciously because: (1) the bond automatically terminated once the IJ administratively closed the case; and (2) even if not, the term "custody" is too vague and unspecific.

Both arguments are not persuasive.  On the first argument, the government fairly points out that the Ortega-Sagbay immigration bond expressly states on its face that an administrative closure is not a basis for cancellation of the bond: "Cancellation of a bond issued as a delivery bond shall occur upon any of the following, provided they occur prior to the date of a breach: . . . termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings."  Docket No. 198-7 (Ex. B at 294) (general terms and conditions for immigration bond).  G&G has no

United States District Court

For the Northern District of California

1   real response to this fact, other than to say that, because the case has been administratively closed

2   for approximately ten years, it should effectively be deemed terminated.  *See* Docket No. 225 (Reply

3   at 2) (arguing that "[i]t appears clear that the immigration proceedings have ended").

4           As to the second argument, G&G has problems here as well.  While "immigration matter" as

5   a stated purpose is vague (see the Cruz-Palacios bond matter), "custody" is not, at least not under the

6   circumstances presented.  Mr. Ortega-Sagbay would have been in custody pending the removal

7   proceedings but for the fact that he posted a bond.  *See* 8 U.S.C. § 1226(a)(2) (providing that "an

8   alien may be arrested and detained pending a decision on whether the alien is to be removed" and

9   that the Attorney General "may release the alien" on a bond of at least $1,500).  That the agency

10  wanted him in custody is understandable given that, just two months earlier, the IJ had felt

11  compelled to administratively close the case because she was not able to notify Mr. Ortega-Sagbay

12  of the hearing.  G&G does not explain what more the agency should have said in the demand notice

13  to be more specific.

14  E.      No Notice of Additional Charges of Admissibility

15          This issue arises in only the Ayala-Sanchez bond matter.  In the original notice to appear,

16  INS identified three reasons for charging Mr. Ayala-Sanchez with being subject to removal:

17  (1)     "You on or about September 29, 2000, requested admission into the United States at San

18          Ysidro Port of Entry by falsely claiming to be a citizen of the United States," in violation of

19          8 U.S.C. § 1182(a)(6)(C)(ii).

20  (2)     "You are an immigrant not in possession of a valid unexpired visa, reentry permit, border

21          crossing card, or other valid entry document required by the Immigration and Nationality

22          Act," in violation of § 1182(a)(7)(A)(i)(I).

23  (3)     "You sought to procure an admission into the United States by fraud or by willfully

24          misrepresenting a material fact," in violation of § 1182(a)(6)(E)(i).

25  Docket No. 159-3 (Ex. B at 1) (notice to appear, dated September 30, 2000).

26          Subsequently – in fact, just a few days after G&G posted a bond on the behalf of Mr. Ayala-

27  Sanchez to secure his release – the agency filed additional charges of inadmissibility against Mr.

28  Ayala-Sanchez, asserting a violation of:

United States District Court
For the Northern District of California

(4)   "Section [1182](a)(2)(A)(i)(II) . . . in that you are an alien who has been convicted of, or who admits having committed, or admits committing acts which constitute the essential elements of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance."

(5)   "Section [1182](a)(2)(A)(i)(I) . . . in that you are an alien who has been convicted or, or who [admits] having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime."

Docket No. 159-3 (Ex. B at 4) (additional charges of inadmissibility, dated January 22, 2001).

There appears to be no dispute that the agency never informed G&G about the additional charges of inadmissibility.  There is also no dispute that the failure to inform constituted a breach of both the Ayala-Sanchez immigration bond and the Amwest settlement agreements.

•   The Ayala-Sanchez immigration bond provides: "Paragraph seven of the settlement in AMWEST SURETY v. RENO, No. 93-3256 JSL (Shx) (C.D. CA) requires that INS send a copy of any new or amended Notice to Appear or amended Order to Show Cause to the obligor."  Docket No. 202-1 (Nye Decl., Ex. 9) (general terms and conditions for immigration bond).

•   Amwest I provides: "INS agrees to send the surety a copy of any new or amended Order to Show Cause."  Docket No. 159-4 (Ex. B at 56) (Amwest I ¶ 7).

•   And Amwest II provides: "In Paragraph 7 of the Settlement, INS agreed to send sureties a copy of any new or amended Order to Show Cause (OSC) issued to a bonded alien.  Under [IIRIRA] this provision will also apply to Notices to Appear, the charging document which replaces OSCs.  Such copy is not a demand on an obligor to produce the alien.  To issue a demand, INS must send an I-340 in addition to the copy of the charging document.  Failure to comply with the requirement to send a copy of the amended document will, however, give obligors a basis for challenging any subsequent attempt to breach the bond.  Such failure does not require cancellation of the bond."  Docket No. 159-5 (Ex. B at 90) (Amwest II).

1   The parties' dispute arises over whether the government's breach, with respect to the above

2   requirement, gives rise to a remedy to G&G.

3        In its decision below, the agency concluded that G&G was not entitled to any remedy

4   because, "[t]hroughout the Amwest settlement agreements, the Agency's violations of certain

5   provisions [expressly] result in the breach determination being rescinded or unenforceable" but,

6   "[i]n contrast to these provisions invalidating a breach determination, the Amwest agreements

7   contain no language stating that a breach is unenforceable or must be rescinded when the Agency

8   does not notify the Bond Obligors of new or amended charges filed against the bonded alien."

9   Docket No. 159-1 (Ex. A at 21-22) (agency decision).  The agency acknowledged that, in Amwest

10  II, "the Bond Obligors are given a 'basis for challenging' a breach decision when the Agency does

11  not give them notice of amended charges," but concluded that "[a] 'basis for challenging a breach' is

12  far different from an express statement that the breach is unenforceable or must be rescinded.  A

13  'basis for challenging' means that the Bond Obligors may question or take exception to the breach,

14  but it does not mean that the breach is automatically invalid or unenforceable."  Docket No. 159-1

15  (Ex. A at 22) (agency decision).  DHS continued:

16          When the INS failed to follow significant procedures set forth in the
            Amwest settlement agreements, the importance of these procedures
17          was underscored by the remedy imposed for such a failure – the
            breach was unenforceable or would be rescinded.  When the
18          procedures were less significant, the settlement agreements contained
            no remedy for any failure to comply.  Notifying bond obligors about
19          new or amended charges against the alien is not a material term of the
            Amwest settlement agreement (or the bond agreement) because, even
20          if the Agency complied with that provision, the bond obligors are not
            relieved of their obligation to deliver the alien.

21

22  Docket No. 159-1 (Ex. A at 22-23) (agency decision).

23        The above reasoning by DHS is problematic, even taking into account the arbitrary-and-

24  capricious standard.  First, Amwest II specifically called out that failure to provide notice of new

25  charges against an alien would "give obligors a basis for challenging any subsequent attempt to

26  breach the bond."  Docket No. 159-5 (Ex. B at 90) (Amwest II).  Given this "call-out," DHS's

27  attempt to minimize (indeed effectively nullify) the importance of the requirement is not convincing.

28  Second, although DHS's assertion that an obligor is not automatically entitled to any remedy is

**United States District Court**
For the Northern District of California

correct, *see* Docket No. 159-5 (Ex. B at 90) (Amwest II) (stating that a failure to comply "does not *require* cancellation of the bond") (emphasis added), that does not mean failure to notify the bonding company that new or amended charges have been filed is *never* material on the ground that, "even if the Agency complied with that provision, the bond obligors are not relieved of their obligation to deliver the alien."  Docket No. 159-1 (Ex. A at 23) (agency decision).  What is missing from this analysis is that a new or amended charge can be material – it may affect what an alien will do as a result.  As G&G points out, with new or additional charges, the risk of flight by the alien increases, and therefore notice to the obligor is particularly important as the increased risk of flight affects its ability to deliver.  *See United States v. LePicard*, 723 F.2d 663, 664-65 (9th Cir. 1984) (concluding that new bond condition materially increased the sureties' risk on the bond and that the sureties were not bound by that condition since they did not have notice of it or consent to it).  Again, as noted above, under basic contract law a material breach may excuse performance.  The addition of charges against the alien may be material because of the resulting increase in risk of flight – a factor which informs the bonding company's willingness to undertake that risk and/or measures it takes to monitor and work with the alien.

Implicitly recognizing this problem, the agency, in its decision below, also stated that the new charges here would not materially increase the likelihood of Mr. Ayala-Sanchez fleeing because "[n]either of these charges constituted an aggravated felony, which would have prevented him from obtaining the benefit of cancellation of removal."  Docket No. 159-1 (Ex. A at 23 (agency decision).  The agency also noted that, even after the new charges were filed, Mr. Ayala-Sanchez continued to appear for proceedings before the immigration court.  *See* Docket No. 159-1 (Ex. A at 23) (agency decision).

The Court questions the agency's first part of its materiality analysis.  Even if the additional charges did not constitute aggravated felonies, the fact that there were now more possible grounds for removal increased the risk of flight.  That being said, the agency also found a lack of materiality because, even after the new charges were filed, Mr. Ayala-Sanchez continued to appear for removal proceedings, and on multiple occasions.  Given the latter factual circumstance, the Court cannot say

United States District Court
For the Northern District of California

1  that the agency acted arbitrarily or capriciously in concluding that the government's breach was not

2  material in this case.

3  F.     Delivery Bond Instead of Supervision Bond

4          This issue arises in only the Singh bond matter.  In June 2003, an IJ ordered Mr. Singh's

5  removal.  *See* Docket No. 195-3 (Ex. B at 5) (IJ order).  Several months later, the BIA affirmed, *see*

6  Docket No. 195-3 (Ex. B at 19-20) (BIA decision), and, in May 2005, the Ninth Circuit denied the

7  petition for review of the BIA decision.  *See* Docket No. 195-3 (Ex. B at 21-22) (Ninth Circuit

8  decision).  Mr. Singh was thereafter sent an I-166 surrender letter.  He failed to appear but

9  eventually was located and apprehended in August 2006.  *See* Docket No. 195-3 (Ex. B at 30)

10  (immigration history).

11          On June 26, 2007, ICE served a "Release on Bond Notification" to Mr. Singh.  The notice

12  stated in relevant part as follows:

13              You are currently detained in the custody of . . . (ICE).  You
                have been ordered removed from the United States.  Your removal
14              does not appear reasonably foreseeable at this time.

15              ICE has reconsidered your release conditions.  ICE has
                determined that your bond will be reduced.  You will be released from
16              custody, pending your removal, under an Order of Supervision upon
                the posting of a **$5,000 bond**.  Your release will be subject to certain
17              conditions that will be outlined on the Order of Supervision (I-220B)
                that will be provided to you shortly and the Addendum to the Order of
18              Supervision forms, and by which you must abide.  **The conditions are
                as follows: 1) you are required to present a current travel
19              document or application for a travel document within 60 days of
                your release; 2) are you are required to do monthly in person
20              reporting to an ICE office until you can be removed.**  *The bond is
                set to ensure that you abide by the conditions of your release in light
21              of your history of failing to appear to ICE.*  Any violation of these
                conditions will result in the bond being breached, as well as you being
22              taken into ICE custody.

23  Docket No. 195-3 (Ex. B at 31) (release on bond notification) (bolded emphasis in original;

24  italicized emphasis added).  The notice was signed by Mr. Singh.

25          On June 28, 2007, the Order of Supervision issued.  *See* Docket No. 195-3 (Ex. B at 36-39)

26  (Order of Supervision, Addendum, and Warning for Failure to Comply with Terms of Supervised

27  Release).  The Order of Supervision contained multiple conditions.  It also warned Mr. Singh that

28  "[a]ny violation of the above conditions may result in a fine, more restrictive release conditions,

United States District Court
For the Northern District of California

1   return to detention, criminal prosecution, and/or revocation of your employment authorization

2   document."  Docket No. 195-3 (Ex. B at 38).  The order was signed by Mr. Singh.

3        On the same day as the Order of Supervision – *i.e.*, June 28, 2007 – G&G posted a bond on

4   behalf of Mr. Singh.  The immigration bond form, signed by both G&G, stated that the bond was

5   "CONDITIONED UPON THE DELIVERY OF AN ALIEN."  Docket No. 195-3 (Ex. B at 40).  The

6   immigration bond form explained such a bond as follows:

> 7        BOND CONDITIONED UPON THE DELIVERY OF AN ALIEN.  In
>      consideration of the granting of the application of the above alien *for*
> 8    *release from custody under a warrant of arrest issued by the Attorney*
>      *General charging that he/she is unlawfully in the United States*,
> 9    provided there is furnished a suitable bond as authorized by Section
>      236 and/or Section 241 of the Immigration and Nationality Act, the
> 10   obligor hereby furnishes such bond with the following conditions if:
>      (1) the alien is released from custody and if the obligor shall cause the
> 11   alien to be produced or to produce himself/herself to an immigration
>      officer or an immigration judge of the United States, as specified in
> 12   the appearance notice, upon each and every written request until
>      exclusion/deportation/removal proceedings in his/her case are finally
> 13   terminated; (2) the said alien is accepted by the INS for detention or
>      deportation/removal; or (3) the bond is otherwise canceled, this
> 14   obligation shall terminate. . . .

15  Docket No. 177-3 (Nye Decl., Ex. 26) (immigration bond) (emphasis added).  In other words, on its

16  face, the bond was a delivery bond only; it was not a supervision bond.  This made little sense

17  because Mr. Singh was not being released from custody under an arrest warrant charging him with

18  being in the United States unlawfully.  Rather, it had already been determined that Mr. Singh was in

19  the United States unlawfully and he was being released instead pursuant to an Order of Supervision.

20  Thus, the issuance of the delivery bond rather than a supervision bond appears to have been a

21  mistake, at the very least on the part of the government.

22       Under the above circumstances, G&G argues that the immigration bond it signed was void

23  *ab initio*.  In its decision below, the agency concluded otherwise, focusing on the fact that

> 24   [t]he terms and conditions of the delivery bond do not require the
>      Bond Obligors to ensure that the alien complied with the requirements
> 25   of the order of supervision.  Because the bond that was posted is a
>      delivery bond, the Bond Obligors were only required to produce the
> 26   alien at the ICE Field Office in response to a demand notice; they were
>      not required to ensure that Mr. Singh complied with all material terms
> 27   of the order of supervision.  Complying with the delivery bond is less
>      onerous to the Bond Obligors than complying with an order of
> 28   supervision bond would have been.  When the Bond Obligors failed to

United States District Court

For the Northern District of California

> produce Mr. Singh in response to the validly issued demand notice,
> they breached the delivery bond.

Docket No. 195-1 (Ex. A at 9) (agency decision).

While the agency's position has some surface appeal, the Court finds it arbitrary and capricious. What is missing from the agency's analysis is the expectations of a surety at the time it puts up an immigration bond. At the time of a delivery bond, an alien is simply subject to removal proceedings; there is no certainty whether or not the alien will actually be removed. There is still hope that the alien may prevail. In contrast, at the time of a supervision bond, the stakes for an alien are markedly different: There has been a determination that the alien *is* to be removed. Consequently, the risk for a surety in putting up a delivery bond is, generally speaking, less compared to that in putting up a supervision bond. Furthermore, as discussed above, the expected period of a delivery bond is typically ninety days. In contrast, a supervision bond would last much longer. Thus, for a number of reasons, a supervision bond may be substantially riskier than a delivery bond.

The agency's focus on the fact that a delivery bond requires a surety to do less compared to a supervision bond misses the point. The relevant question here is whether the surety would have agreed to put up a bond *in the first place* if it knew that what was being required was supervision bond rather than delivery bond because the risk to the surety was different. Whether or not G&G itself has ever actually put up a supervision bond[13] is not material. The agency's failure to take this factor into consideration in and of itself renders its decision arbitrary and capricious.

G.    <u>Failure to Provide the Alien with Voluntary Departure Instructions</u>

This issue arises in several bond matters. For purposes of this opinion, the Court shall focus on the Lee bond matter as a representative matter.

G&G posted a delivery bond on behalf of Ms. Lee, more specifically, in December 2005. *See* Docket No. 165-3 (Ex. B at 5) (immigration bond). However, subsequently, in April 2006, an IJ issued an order granting Ms. Lee's application for voluntary departure. *See* Docket No. 165-3 (Ex.

---

[13] At the hearing, G&G claimed it has not, but this is not part of the administrative record.

B at 8) (IJ order).  It appears that, on or after that date, DHS never provided Ms. Lee with voluntary departure instructions.

The Lee bond itself does not contain any requirement that Ms. Lee be given voluntary departure instructions (which makes sense since the Lee bond was a delivery bond and not a voluntary departure bond).  However, the Amwest I and II settlement agreements do include a requirement on voluntary departure instructions.  More specifically:

- *Amwest I.*  Exhibit E of Amwest I – titled "Verification of Departure" – is one of the Policy Statements.  Section IV is a clarification of government policy.  It states in relevant part: "INS trial attorneys will be provided written instructions regarding voluntary departure procedures.  The trial attorney will serve a copy of the voluntary departure procedures upon the alien at the time of the deportation or exclusion proceeding at which voluntary departure is granted.  The voluntary departure procedures served upon the alien shall also advise the alien to notify his surety and/or to seek advice from his surety to help effectuate a proper voluntary departure."  Docket No. 165-3 (Ex. B at 44) (Amwest I, Ex. E).

- *Amwest II.*  The INS field memo attached to the settlement agreement provides in relevant part: "INS also agreed to provide its trial attorneys with 'written instructions regarding voluntary departure procedures,' which they will then serve on 'the alien at the time of the deportation or exclusion [or removal] proceeding at which voluntary departure is granted.' Although not expressly stated, INS should also, to the maximum extent possible, serve a copy of these procedures when it or an Immigration Judge grants voluntary departure at some stage other than the completion of the proceedings.  A copy of the procedures to be served is attached as Attachment C."  Docket No. 165-4 (Ex. B at 78) (Amwest II, Ex. A) (INS field memo).

The government argues that, although DHS had an obligation to provide voluntary departure instructions to the alien, any failure to provide instructions does not mean that G&G is entitled to any remedy.  The Court agrees.  Materiality of breach is the critical question here.  G&G contends that, if voluntary departure instructions had been provided, then the alien would have voluntarily departed which then would have resulted in cancellation of the delivery bond.  But this is largely

United States District Court
For the Northern District of California

1    speculative.  More to the point, regardless of whether the alien could have obviated removal (and

2    hence the delivery demand) by complying with and fulfilling the voluntary departure requirements,

3    the fact remains that, in the final analysis, a delivery demand was properly and timely made.  G&G

4    failed to deliver the alien pursuant to that demand.

5          At the hearing, G&G argued that it would be virtually impossible for it to ever show

6    materiality of the breach at issue here.  This might well be the case, at least where, as here, a timely

7    delivery demand ultimately ensued.  The fact that materiality might be difficult to establish,

8    however, is not a reason to obviate the materiality requirement.  If the obligation to provide

9    voluntary departure instructions was so critical, as G&G contends, then G&G should have

10   negotiated, as part of the Amwest agreements, for an automatic remedy upon breach of the

11   obligation.  After all, G&G knew or should have known that, absent voluntary departure, removal

12   would be the alternative, which would eventually implicate its duty to deliver under the delivery

13   bond.  *See* 8 C.F.R. § 1240.26(d) ("Upon granting a request made for voluntary departure either

14   prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge

15   shall also enter an alternate order of removal.").  Accordingly, the Court concludes that the agency

16   did not act arbitrarily or capriciously in finding that the failure to provide voluntary departure

17   instructions was not a basis to grant G&G relief.

18   H.    Impact of a Grant of Voluntary Departure

19         This issue arises in only the Lee bond matter.  Here, the agency rejected G&G's argument

20   that its delivery bond was automatically canceled once the IJ granted voluntary departure to Ms.

21   Lee.  In evaluating this issue, the Court bears in mind that, at the time that the IJ granted Ms. Lee

22   voluntary departure, it did *not* require her to post a voluntary departure bond.

23         G&G argues that the delivery bond should have been automatically canceled once the IJ

24   granted voluntary departure because the granting of voluntary departure was a new condition that

25   exceeded G&G's undertaking.  This argument is not persuasive because nothing about G&G's

26   obligations under the delivery bond changed with the grant of voluntary departure.  Under the

27   delivery bond, G&G was only required to deliver Mr. Lee.  The government is not arguing that

28   G&G now had an obligation under the delivery bond to ensure her voluntary departure.

United States District Court
For the Northern District of California

1    Furthermore, while issuance of a voluntary departure bond would automatically result in

2    cancellation of the delivery bond, *see* Docket No. 165-9 (Ex. B at 962) (general terms and conditions

3    for immigration bond) (providing that a delivery bond is cancelled upon "issuance of a new delivery

4    or voluntary departure bond on the bonded alien"), here, the IJ never required the posting of a

5    voluntary departure bond.

6    G&G argues still that its position is correct because "section 12.11(a) of the Detention and

7    Deportation Officer's Field Manual provides that if the immigration judge does not require a

8    voluntary departure bond, the delivery bond is to be cancelled."  Docket No. 205 (Opp'n at 11); *see*

9    *also* Docket No. 205-1 (Nye Decl., Ex. 21) (excerpt from Field Manual).  The Field Manual does

10   state: "If the immigration judge neither requires a [voluntary departure] bond nor imposes any other

11   condition for voluntary departure (e.g., surrender of passport), cancel the delivery bond (if any)."

12   Docket No. 205-1 (Nye Decl., Ex. 21) (excerpt from Field Manual).  But G&G ignores the

13   preceding paragraph/sentence which states: "Do not cancel the delivery bond until the alien has met

14   all requirements for voluntary departure."  Docket No. 205-1 (Nye Decl., Ex. 21) (excerpt from

15   Field Manual).  This suggests that there should not be cancellation of the delivery bond until the

16   alien actually voluntarily departs.

17   Finally, as the government points out, there is case law contrary to G&G's position.  *See*

18   *Safety Nat'l*, 711 F. Supp. 2d at 721 ("agree[ing] that Defendants could reasonably determine that a

19   delivery bond did not cancel when an alien was granted voluntary departure without the issuance of

20   a new voluntary departure bond").  It makes sense that a delivery bond is not automatically canceled

21   simply upon the granting of voluntary departure because, as the government notes, removal is

22   always an alternative to voluntary departure should it not work out.  *See* 8 C.F.R. § 1240.26(d)

23   ("Upon granting a request made for voluntary departure either prior to the completion of

24   proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate

25   order of removal.").  The Court therefore does not find any arbitrary or capricious action on the part

26   of the agency in declining to grant G&G relief.

27

28

United States District Court

For the Northern District of California

I.        Impact of the Alien Departing the United States

This issue arises in only the Rodriguez-Yanez bond matter.  In April 2010, G&G posted a delivery bond on behalf of Mr. Rodriguez-Yanez.  *See* Docket No. 163-3 (Ex. B at 5 (immigration bond).  In January  2011, the IJ issued an order granting Mr. Rodriguez-Yanez's application for voluntary departure.  Because voluntary departure was granted before conclusion of the removal proceedings, the IJ could have, but did not, require Mr. Rodriguez-Yanez to post a voluntary departure bond.  *See* Docket No. 163-3 (Ex. B at 10-12) (IJ order).  At the time voluntary departure was granted, the agency did not give Mr. Rodriguez-Yanez voluntary departure instructions.

After voluntary departure was granted, the agency sent, in February 2011, a delivery demand to G&G based on the delivery bond.  The delivery demand stated that its purpose was for an "exit interview and issuance of departure verification."  Docket No. 163-3 (Ex. B at 13) (I-340).  Because G&G failed to deliver Mr. Rodriguez-Yanez in March 2011, the agency declared a bond breach in April 2011.  *See* Docket No. 163-3 (Ex. B at 19) (I-323).

Shortly thereafter, Mr. Rodriguez-Yanez made an appearance at an agency office – "apparently with the indemnitor on the bond, Armando Ibarra," Docket No. 163-1 (Ex. A at 4) (agency decision) – to participate in the exit interview and receive the departure verification form. "Mr. Rodriguez-Yanez appeared at the ICE Office at the instigation of Mr. Ibarra 37 days after the surrender date set forth in the demand notice and six days after the breach notice had been issued." Docket No. 163-1 (Ex. A at 4) (agency decision).

In May 2011, Mr. Rodriguez-Yanez voluntarily left the United States.  G&G argues that, once Mr. Rodriguez-Yanez left the United States, the delivery bond automatically cancelled and therefore it cannot be held in breach.

G&G's position is not compelling.  First, for the Rodriguez-Yanez bond, the voluntary departure of an alien can be the basis for cancellation of the delivery bond but only if the departure takes place before the bond breach.  That is an express term in the immigration bond.  *See* Docket No. 163-3 (Ex. B at 7) (general terms and conditions for immigration bond) ("Cancellation of a bond issued as a delivery bond shall occur upon any of the following, provided they occur *prior* to the

date of a breach: . . . voluntary departure by the bonded alien as evidenced by valid proof thereof.")

(emphasis added).

Second, the agency's failure to provide Mr. Rodriguez-Yanez with voluntary departure instructions is immaterial. Even if the agency should have given Mr. Rodriguez-Yanez instructions at the time voluntary departure was granted, that did not preclude the agency from seeking delivery of the alien thereafter to provide him with information and/or get information from him. G&G had an obligation to deliver under the immigration bond, which it did not do. There is no showing that the delivery demand here was defective.

Third, that Mr. Rodriguez-Yanez or the indemnitor (Mr. Ibarra) may have acted in good faith is independent of whether G&G fulfilled its obligation under the immigration bond to deliver upon request by the agency.

Fourth, with respect to G&G's argument that any debt owed should be reduced based on an agency mitigation policy, *see* Nye Decl., Ex. 21 (May 2013 internal DHS memo), that argument was never presented to the agency. Furthermore, on the merits, it is problematic for the reasons argued in the government's reply brief:

> [T]he agency's mitigation policy does not apply when an alien voluntarily departs after the breach date. It only applies when the obligor surrenders the alien late to an ICE office. Here, *G&G* did not comply with its delivery obligation under the bond. Instead, the *indemnitor* on the bond brought Rodriguez-Yanez to the ICE office thirty-seven days after the surrender date.[14]

Docket No. 218 (Reply at 3) (emphasis in original); *see also* Docket No. 207-1 (Nye Decl., Ex. 21) (May 2013 internal DHS memo) (stating that, "under certain conditions outlined in this memo, surrendering aliens in deviance from the demand letter may reduce the amount of breach," which "encourages bond obligors to surrender a greater number of aliens than under previous conditions and further impedes the growth of the absconder population") (emphasis added).

---

[14] There is nothing in the record demonstrating that any break given to the surety would redound to the benefit of the indemnitor. The agency's decision was not arbitrary or capricious.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

J.      Right to Post a Voluntary Departure Bond

This issue arises in only the Recinos-Flores bond matter.  Here, G&G posted a delivery bond on behalf of Mr. Recinos-Flores.  *See* Docket No. 194-3 (Ex. B at 5) (immigration bond). Subsequently, an IJ granted Mr. Recinos-Flores's application for voluntary departure, provided that he post a voluntary departure bond.  If he did not, then the grant of voluntary departure would be withdrawn and the alternate order of removal would become effective immediately.  *See* Docket No. 194-3 (Ex. B at 8-9) (IJ order).  At the time he was granted voluntary departure, the agency never provided Mr. Recinos-Flores with voluntary departure instructions.  Ultimately, Mr. Recinos-Flores failed to post a voluntary departure bond.

Several months after Mr. Recinos-Flores failed to post the voluntary departure bond, the agency sent a delivery demand to G&G in order to effectuate the alien's removal.  *See* Docket No. 194-3 (Ex. B at 11) (I-340).  G&G failed to deliver Mr. Recinos-Flores, thus leading the agency to declare the bond breached.

G&G's argument hinges in large part on the agency's failure to provide Mr. Recinos-Flores with voluntary departure instructions.  According to G&G, the instructions would have advised Mr. Recinos-Flores that he could contact his surety to help him with the voluntary departure process. "In lieu of DHS's failure to provide [voluntary departure] instructions, DHS should have notified G&G/ASC of the voluntary departure order and G&G/ASC's right to post a voluntary departure bond."  Docket No. 174 (Mot. at 11).  G&G further argues that it could have mitigated its damages on the delivery bond if it had received notice of the voluntary departure order because (1) it could then have posted a voluntary departure bond which (2) would then, under the terms of the delivery bond, have resulted in an automatic cancellation of the delivery bond.

G&G's argument is not persuasive for several reasons.  First, as noted above, failure to provide voluntary departure instructions was not shown to be a material breach.  As to the alternatives posited by G&G, as the government argues, G&G's position is speculative because G&G had no control over whether Mr. Recinos-Flores would actually have wanted G&G to post a voluntary departure bond for him.  Moreover, the mitigation argument makes little sense because the

35

agency did not even make a delivery demand to G&G until *after* Mr. Recinos-Flores failed to voluntarily depart and therefore the agency sought to remove him.

K.     <u>Summary</u>

The Court's analysis of the issues above leads to the following results.

(1)     The Court grants summary judgment to G&G, and denies summary judgment to the government, with respect to the following bond matters (if only because the agency was arbitrary and capricious in holding that it did not have to issue a delivery demand to G&G within the ninety-day removal period):

- Mr. Velasquez-Ortega;

- Mr. Ayala-Sanchez;

- Ms. Mi Lee;

- Mr. Yeh;

- Mr. Antonio;

- Ms. Cruz-Palacios; and

- Mr. Recinos-Flores.

(2)     The Court grants summary judgment to the government, and denies summary judgment G&G, with respect to the Rodriguez-Yanez bond matter because the agency did not act arbitrarily and capriciously in concluding that its failure to provide voluntary departure instructions was not material and that the immigration bond was not canceled upon the alien's departure from the United States.

(3)     The Court grants summary judgment to G&G, and denies summary judgment to the government, with respect to the Singh bond matter because the agency was arbitrary and capricious in holding that a delivery bond could be posted for the release of an alien under an order of supervision.

(4)     The Court grants summary judgment to the government, and denies summary judgment to G&G, with respect to the Ortega-Sagbay bond matter because the agency was not arbitrary and capricious in holding that it sufficiently identified the purpose behind the delivery demand for the alien.

**United States District Court**
For the Northern District of California

L.      Interest, Costs, and Penalties

Because the Court has ruled in favor of the government on at least some of the bond matters, the Court must also resolve the issue of whether the government's assessment of interest, costs, and penalties on the debts owed to the government was proper.

G&G does not seriously dispute that DHS has the authority to charge interest, costs, and penalties on the debts owed. *See, e.g.*, 31 U.S.C. § 3717(a)(1) (providing that the head of an agency "shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim"); 31 C.F.R. § 901.9(a) (providing that "agencies shall charge interest, penalties, and administrative costs on debts owed to the United States pursuant to 31 U.S.C. § 3717"). It argues, however, that DHS has the authority to waive such sums, and such should have been done here.

Title 31 C.F.R. § 901.9(g) provides: "[A]gencies may waive interest, penalties, and administrative costs charged under this section, in whole or in part, without regard to the amount of the debt, either under the criteria set forth in these standards for the compromise of debts, or if the agency determines that collection of these charges is against equity and good conscience or is not in the best interest of the United States." 31 C.F.R. § 901.9(g). According to the government, because the decision on waiver is solely within DHS's discretion, the decision is not reviewable pursuant to 5 U.S.C. § 701(a)(2). *See* 5 U.S.C. § 701(a)(2) (providing that "[t]his chapter applies . . . except to the extent that agency action is committed to agency discretion by law").

The Court rejects the government's argument that its decision on waiver is not reviewable. The Ninth Circuit has explained that the "narrow exception [under § 701(a)(2)] to the presumption of judicial review of agency action under the APA applies 'if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1082 (9th Cir. 2014); *see also Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011). In determining whether judicial review is precluded on § 701(a)(2) grounds, a court should consider not only the statute at issue but also regulations, established agency policies, or judicial decisions for a meaningful standard to review. *See id.* Here, there is a meaningful standard to review within the relevant regulation – *i.e.*, "agencies

may waive interest, penalties, and administrative costs . . . under the criteria set forth in these standards for the compromise of debts, or if the agency determines that collection of these charges is against equity and good conscience or is not in the best interest of the United States." 31 C.F.R. § 901.9(g).

Of course, this standard is – as the government takes care to point out – fairly deferential to the government. The statute essentially gives the government discretion as to whether or not to waive interest, costs, and penalties. That being said, the abuse-of-discretion standard is not without any teeth, and therefore, on the merits, the Court does give some scrutiny to the reasons underlying the assessment of each item at issue (*i.e.*, interest, costs, and penalties). Although the parties have addressed these items collectively in their papers, that approach glosses over the purpose behind each.

     1.    <u>Interest</u>

As to interest, the Court cannot say that the government abused its discretion in declining to grant waiver. The purpose behind interest is to compensate for the loss of use of money. By failing to pay the government the debts owed, G&G deprived the government of the use of its money.

G&G contends that the interest amount is excessive because the government delayed in getting the dispute between the parties resolved, but that argument is not persuasive, particularly given the abuse-of-discretion standard. For example, G&G argues that the government unreasonably delayed resolution by refusing to produce the A-files for the aliens and by failing to render an administrative decision susceptible to challenge and/or judicial review until ordered by the Court (*i.e.*, there was no administrative record until the Court remanded). But, based on the papers submitted, it is not clear that the A-files were that significant with respect to the matters where the government prevailed. As to G&G's assertion that the government failed to give an administrative decision susceptible to challenge and/or judicial review until ordered by the Court, the government fairly points out that G&G also had a hand in delay – *i.e.*, G&G itself has engaged in a pattern and practice of not getting the alleged bond breaches resolved promptly. For example, had G&G administratively appealed the notice of bond breach, then a record would likely have been developed and an agency decision issued. The bottom line is that, under the totality of the circumstances, an

United States District Court

For the Northern District of California

1  abuse of discretion cannot be said to have occurred because both parties have conducted themselves

2  in such a way as to prolong resolution of their disputes.  Furthermore, in any event, regardless of

3  fault, G&G had use of the money while the government did not.

4       G&G tenders two additional arguments as to why interest should not have been assessed: (1)

5  because it offered to pay the principal debt in 2005 and 2007 and (2) because this Court has in a

6  related case stayed the accrual of interest.  Neither argument is compelling, especially under the

7  abuse-of-discretion standard.  That G&G offered to pay the principal does not address the fact that,

8  at the time of the offer, there was not just principal owed but also interest on that principal (as well

9  as costs and penalties).  Therefore, the government was still being deprived of the full use of its

10  money.  As for this Court's ruling in a related case, that case was teed up differently.  There, the

11  government was asking for a stay and, given that request, it was fair to cut off the accrual of interest

12  during the stay.

13       2.       Costs

14       The purpose behind administrative costs is to "'cover the costs associated with collecting a

15  debt from the date of delinquency.'"  Docket No. 198-1 (Ex. A at 15) (agency decision).  Given that

16  this purpose is similar to that above for interest (*i.e.*, as a general matter, to compensate the

17  government for a loss), the Court's reasoning above as to interest is largely applicable here.  The

18  Court also notes that G&G's offer to pay the principal clearly would not cut the government off

19  from accruing additional costs to collect the debt, especially given G&G's reservation of rights and

20  its unwillingness to also pay for interest and penalties accrued up to that point.

21       3.       Penalties

22       While the Court does not see an abuse of discretion with respect to the decision not to waive

23  interest or costs, it evaluates penalties differently.  As the agency notes, the purpose behind a penalty

24  is to "'discourage delinquencies and encourage early payment of the delinquent debt in full.'"

25  Docket No. 198-1 (Ex. A at 15) (agency decision).  Given this purpose, the Court is troubled by the

26  need for the government to continue to assess penalties once G&G made the offer to pay the

27  principal debt.  In this case, G&G's tender was not conditioned on the government giving up any

28  legal rights or waiving any claims.  The only thing G&G asked was that G&G not be deemed to

United States District Court

For the Northern District of California

have waived *its* right to contest the validity of the bonds in bringing an action seeking a refund. That ICE preferred a different forum and procedure for adjudicating the claims is not a good and sufficient reason to allow it to continue to assess penalties on the sum tendered by G&G.

The Court acknowledges that G&G did not offer to make a full payment – *i.e.*, it was offering to pay principal only, not principal along with any accrued interest, costs, and penalties. Nevertheless, the general purpose behind the penalty was being served given G&G's offer to pay the principal. Accordingly, while a close call, the Court concludes that there was an abuse of discretion when the government continued to assess penalties relative to the amounts tendered by G&G towards the principal.[15]

### III.   CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1)   Jose Velasquez-Ortega. The government's motion (Docket No. 156) is denied. G&G's motion (Docket No. 209) is granted.

(2)   Francisco Ayala-Sanchez. The government's motion (Docket No. 159) is denied. G&G's motion (Docket No. 202) is granted.

(3)   Jose Rodriguez-Yanez. The government's motion (Docket No. 163) is granted. G&G's motion (Docket No. 207) is denied.

(4)   So Mi Lee. The government's motion (Docket No. 165) is denied. G&G's motion (Docket No. 205) is granted.

(5)   Yi Chun Yeh. G&G's motion (Docket No. 167) is granted. The government's motion (Docket No. 191) is denied.

(6)   Martin Nicholas Antonio. G&G's motion (Docket No. 169) is granted. The government's motion (Docket No. 192) is denied.

---

[15] The government points out that, even though G&G was offering to pay the principal, under federal law, the government would have had to apply any payment first to fees and last to principal. *See* Docket No. 198 (Opp'n at 10) (citing 31 C.F.R. § 901.9(f)). The Court acknowledges such, but that does not detract from the fact that, given G&G's offer, the general purpose behind the penalty was being served.

(7)      Ingrid Maricela Cruz-Palacios.  G&G's motion (Docket No. 171) is granted.  The government's motion (Docket No. 193) is denied.

(8)      Leonel Antonio Recinos-Flores.  G&G's motion (Docket No. 174) is granted.  The government's motion (Docket No. 194) is denied.

(9)      Sandeep Singh.  G&G's motion (Docket No. 176) is granted.  The government's motion (Docket No. 195) is denied.

(10)    Miguel Antonio Ortega-Sagbay.  G&G's motion (Docket No. 182) is denied.  The government's motion (Docket No. 198) is granted.

As to the Rodriguez-Yanez and Ortega-Sagbay bond matters where the government has prevailed on the merits, the government did not abuse its discretion in declining to waive interest and costs.  The government abused its discretion in declining to waive penalties but only for those penalties that accrued after G&G offered to pay the principal debt.

This order disposes of Docket Nos. 156, 159, 163, 165, 167, 169, 171, 174, 176, and 182. This order also disposes of Docket No. 242.

IT IS SO ORDERED.

Dated:  May 5, 2015

_____
EDWARD M. CHEN
United States District Judge