**United States District Court**

For the Northern District of California

1
2
3
4
5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7

8

UNITED STATES OF AMERICA,                    No. C-09-4029 EMC

9

            Plaintiff,

10

     v.                                       **ORDER RE MOTIONS FOR
                                              SUMMARY JUDGMENT**

11

GONZALES & GONZALES BONDS AND
INSURANCE AGENCY, INC., *et al.*,

12

                                              **(Docket Nos. 157, 162, 178, 180, 184, 186)**

            Defendants.

13

_____/

14
15
16

        The Court previously resolved ten out of the twenty bellwether bond summary judgment

17

motions.  Subsequently, the parties agreed that, of the remaining ten, only six were in need of further

18

judicial resolution.  The six bond matters identified by the parties are as follows:

19

(1)     Fnu Siao Phing (Docket No. 157) (government's motion);

20

(2)     Mumtaz Hassanali Abdullah (Docket No. 162) (government's motion);

21

(3)     Roberto Almeida-Bolanos (Docket No. 178) (G&G's[1] motion);

22

(4)     Vidal Vasquez-Rodas (Docket No. 180) (G&G's motion);

23

(5)     Athos Martins (Docket No. 184) (G&G's motion); and

24

(6)     Winny Suinda (Docket No. 186) (G&G's motion).

25
26
27

_____

28

        [1] There are actually two named defendants in this case: (1) Gonzales & Gonzales Bonds and
Insurance Agency, Inc. and (2) American Surety Company.  For purposes of this memo, the Court
refers to Defendants collectively as "G&G."

**United States District Court**

For the Northern District of California

The government, however, also argued there were additional issues in need of resolution most of which were related to the first ten bond matters. The government identified five additional issues as part of the parties' joint case management statement of May 21, 2015. *See* Docket No. 247 (joint case management statement). The additional issues implicate in part bond matters that the Court previously ruled on (*e.g.*, Singh and Lee) – but only as representative matters.

At the case management conference of May 28, 2015, the Court agreed to address both the six motions identified above and the additional issues identified by the government. This order addresses the six motions and the additional issues.

## I.   GENERAL PRINCIPLES

The Court incorporates by reference the "General Principles" section that was part of the Court's order on the first ten bellwether bond summary judgment motions. *See* Docket No. 244 (Order at 3-8).

## II.   ISSUE NO. 1:

## DELIVERY DEMANDS AND VOLUNTARY DEPARTURE BONDS

In their joint CMC statement, the parties identify two bonds affected by Issue No. 1: Phing and Abdullah. The Court shall use the Phing bond matter as a representative bond matter.

The basic dispute in Issue No. 1 is whether the government was required to send a delivery demand to G&G before G&G had to perform its obligations under a voluntary departure ("VD") bond (as opposed to a delivery bond). According to G&G, the government was required to do so. *See* Opp'n (Phing) at 6 (contending that the "Phing[] bond required DHS to issue a request to produce to G&G/ASC to trigger G&G/ASC's obligation under the bond"). The government disagrees, asserting that, "[a]lthough [the] bond *permitted* DHS, in its discretion, to send a delivery demand until [the alien] departed, such a delivery demand was *not a condition precedent* to G&G's obligations under [the] VD bond." Mot. (Phing) at 4 (emphasis added).

The dispute is one of contract interpretation. The Phing bond at issue – which used the 1997 version of the immigration bond – provided in relevant part as follows:

- "A delivery, exclusion, or voluntary departure bond is breached when the obligor either fails to produce the alien as demanded, or fails to comply with any other term of the bond." Mot.

United States District Court

For the Northern District of California

(Phing), Ex. B at 138 (general terms and conditions for the 1997 version of the immigration bond).

• "BOND CONDITIONED FOR VOLUNTARY DEPARTURE OF AN ALIEN[.]  In consideration of the granting by the Attorney General of an application of the above alien to depart voluntarily from the United States, provided there is furnished a suitable bond . . . , the obligor hereby furnishes such bond with the following conditions if: (1) the obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer, upon each and every written request until the alien voluntarily departs the United States in a timely manner and provides probative documentation of the departure; or (2) the alien is actually accepted by the INS for detention or deportation/removal, this obligation shall terminate." Mot. (Phing), Ex. B at 141 (1997 version of the immigration bond).

The agency, in its decision below, held that "[t]his language does not require the Agency to issue a demand notice to the Bond obligors. . . . The bond language allows ICE to issue a demand notice to require the alien's surrender, but the obligor is also required to ensure that the alien departs the United States in a timely manner and provide probative evidence of the departure."  Mot. (Phing), Ex. A at 8 (agency decision).  The agency also noted:

> [The] fundamental purpose of a voluntary departure bond is reflected in the regulations in effect at the time Ms. Siao Phing's voluntary departure bond was issued.  The regulation stated that an IJ may impose such conditions as necessary to ensure the alien's timely departure from the United States, "including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified."  No demand notice is required because voluntary departure bonds are issued to ensure that the alien departs the United States on or before the date set by the immigration court.

Mot. (Phing), Ex. A at 8 (agency decision).

The agency's interpretation of the bond is neither arbitrary nor capricious.  As the agency pointed out, the bond allowed the agency to make delivery demands and provided that, if there were a failure to produce the alien in response to a delivery demand, G&G would be held in breach. However, the bond did not provide that the agency *had* to make a delivery demand before G&G was required to ensure that the alien voluntarily departed the country.  Furthermore, as the agency implicitly noted, it was not impossible for G&G to ensure voluntary departure in the absence of a delivery demand.[2]

_____

[2] Indeed, it should be noted that one of the main purposes behind voluntary departure is to ease the burden on the government.  With voluntary departure, the government does not need to get involved in the mechanics of the alien's departure.  *See Dada v. Mukasey*, 554 U.S. 1, 11 (2008)

1    G&G's arguments in its brief are unavailing.  For example, G&G points out that language

2    used in the 1999 version of the bond is different – *i.e.*, the 1999 version makes no mention of a

3    delivery demand or request to produce in conjunction with a voluntary departure bond.  For

4    example:

5    • "A voluntary departure bond is breached when the obligor fails to present valid proof
        that the bonded alien departed the United States on or before the date specified in the
6        order granting voluntary departure within 30 days of that date."  Mot. (Phing), Ex. B
        at 143 (general terms and conditions for 1999 version of the immigration bond).

7    • "BOND CONDITIONED UPON THE VOLUNTARY DEPARTURE OF AN
8        ALIEN.  In consideration of the granting by the Attorney General of an application of
        the above alien to depart voluntarily from the United States, provided there is
9        furnished a suitable bond . . . [,] the obligor hereby furnishes such a bond with the
        following conditions if: (1) the obligor ensures that the alien departs the United States
10       on or before the date specified in the order granting voluntary departure, and provides
        probative documentation of the departure; or (2) the alien is actually accepted by the
11       INS for detention or deportation/removal, this obligation shall terminate."  Mot.
        (Phing), Ex. B at 145 (1999 version of the immigration bond).
12

13   While G&G is correct that the 1999 bond does not mention a delivery demand, that still does not

14   mean the 1997 bond – which did – makes a delivery demand a condition precedent to G&G's

15   performance under the bond.  Under the 1997 bond, the agency was given the option, not a mandate.

16   G&G suggests that, at the very least, the language of the 1997 bond and/or the language of

17   the 1999 bond create an ambiguity which should be construed against the government.  *See* Opp'n

18   (Phing) at 5 (asserting that "[t]he 'contra proferentum' doctrine, which requires ambiguities to be

19   construed against the drafter, should prevail").  There is ambiguity where reasonable people could

20   find a contract term susceptible to more than one interpretation.  *See Tehama-Colusa Canal Auth. v.*

21   *United States DOI*, 819 F. Supp. 2d 956, 988 (E.D. Cal. 2011) (stating that, under federal common

22   law, a contract is ambiguous where reasonable people could find its terms susceptible to more than

23   one interpretation).  But under the arbitrary-and-capricious standard of review which applies here,

24   ambiguity actually runs in the government's favor.  If the agency's interpretation is a reasonably

25   susceptible one, that is sufficient for the agency to survive arbitrary-and-capricious review.

26   _____

27   (noting that "the alien's agreement to leave voluntarily expedites the departure process and avoids
28   the expense of deportation – including procuring necessary documents and detaining the alien
     pending deportation").

4

**United States District Court**
For the Northern District of California

### III.   ISSUE NO. 2:

### CHANGE IN VOLUNTARY DEPARTURE DATE

In their joint CMC statement, the parties identify four bond matters that address Issue No. 2: Vasquez-Rodas, Suinda, Abdullah, and Phing.  The Court shall use the Phing bond matter as a representative bond matter.

The basic dispute in Issue No. 2 concerns a change in Ms. Phing's voluntary departure date. G&G contends that, "DHS must cancel a voluntary departure bond once the voluntary departure date is altered during the immigration proceedings."  Opp'n (Phing) at 8.  The government disagrees.

With respect to Ms. Phing, the immigration judge ("IJ") held a proceeding in March 1999 during which he denied Ms. Phing certain relief but granted her voluntary departure.  *See* Mot. (Phing), Ex. B at 19 (IJ oral decision).  The IJ ordered Ms. Phing to voluntarily depart by May 24, 1999.  *See* Mot. (Phing), Ex. B at 4 (IJ order).  Shortly thereafter, G&G posted a voluntary departure bond on Ms. Phing's behalf.  *See* Mot. (Phing), Ex. B at 22.  Ms. Phing then appealed the IJ decision to the Board of Immigration Appeals ("BIA").  Because of her appeal, the voluntary departure date imposed by the IJ was effectively stayed.[3]  The stay was automatic under the immigration regulations.  *See* 8 C.F.R. § 1003.6(a) (providing that "the decision in any proceeding under this chapter from which an appeal to the Board [of Immigration Appeals] may be taken shall not be executed during the time allowed for the filing of an appeal . . . nor shall such decision be executed while an appeal is pending or while a case is before the Board by way of certification").  The BIA ultimately issued its decision on March 12, 2003.  *See* Mot. (Phing), Ex. B at 25 (BIA order).  In that decision, the BIA stated: "Pursuant to the Immigration Judge's order and conditioned upon compliance with conditions set forth by the Immigration Judge and the statute, the alien is permitted to voluntarily depart from the United States, without expense to the Government, within 30 days from the date of this order [*i.e.*, on or before April 11, 2003]."  Mot., Ex. B at 25 (BIA order).

G&G seems to argue that, under the Phing bond, it contracted for a voluntary departure date of May 24, 1999, and once that date "ceased to exist" because of Ms. Phing's appeal, the bond

---

[3] A stay makes sense otherwise an alien would likely have to voluntarily depart before the appeal to the BIA is resolved.

United States District Court

For the Northern District of California

1    automatically cancelled.  *See* Opp'n (Phing) at 8 (arguing that, "[o]nce the May 24, 1999, date was

2    cancelled, G&G/ASC could not cause Ms. Siao Phing to be produced for departure by that date").

3    G&G also contends that, under Ninth Circuit case law, "sureties are no longer liable for bonds

4    written under conditions that were subsequently altered by a court," and "[t]his requirement should

5    apply with greater weight and effect where, as happened in this case, DHS never notified G&G/ASC

6    that the underlying [voluntary departure] date had been changed."  Opp'n (Phing) at 8.

7         The agency rejected G&G's argument below, noting that, under the terms of the Phing bond,

8    the government was not required to give notice of any change in voluntary departure date.  The

9    Phing bond included the following statement: "Paragraph seven of the settlement in <u>AMWEST</u>

10   <u>SURETY</u> v. <u>RENO</u>, No. 93-3256 JSL (Shx) (C.D. CA) requires that INS send a copy of any new or

11   amended Notice to Appear or amended Order to Show Cause to the obligor.  *INS is not required to*

12   *give the obligor notice of any other actions related to the bonded alien's Immigration court*

13   *proceedings.*"  Mot. (Phing), Ex. B at 138 (general terms and conditions for 1997 version of the

14   immigration bond) (emphasis added); *see also* Mot. (Phing), Ex. A at 11-12 (agency decision)

15   (discussing this provision in the Phing bond).  The agency then stated that the "argument that the

16   Government has added a new condition to the bond that materially increases [the bond obligors']

17   risk finds no support in the law."  Mot. (Phing), Ex. A at 12 (agency decision).  It explained:

18   "Because of the longstanding precedent establishing that an appeal tolls the running of the voluntary

19   departure period, the Bond Obligors were on notice at the time of entering into the bond contract

20   that the date of the voluntary departure might be extended."  Mot. (Phing), Ex. A at 13 (agency

21   decision).

22        The agency's decision below was not arbitrary or capricious, nor was it legally erroneous to

23   the extent de novo review might apply.  G&G's position is problematic because it is – in essence –

24   predicated on the contention that it contracted for a voluntary departure date of May 24, 1999, and

25   no other.  But the face of the Phing bond says nothing about a specific voluntary departure date.  The

26   bond simply states:

27         BOND CONDITIONED FOR VOLUNTARY DEPARTURE OF AN
            ALIEN[.]  In consideration of the granting by the Attorney General of
28          an application of the above alien to depart voluntarily from the United

6

> States, provided there is furnished a suitable bond . . . , the obligor hereby furnishes such bond with the following conditions if: (1) the obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer, upon each and every written request until the alien voluntarily departs the United States in a timely manner and provides probative documentation of the departure; or (2) the alien is actually accepted by the INS for detention or deportation/removal, this obligation shall terminate.

Mot. (Phing), Ex. B at 141 (1997 version of the immigration bond).  And given that there is an immigration regulation that essentially provides for a stay, G&G knew or should have known at the time it entered into the bond agreement that the voluntary departure date of Ms. Phing could (and in likelihood would) change if she were to take an appeal.

As it did during the agency proceedings below, G&G argues here that

> [c]ase law holds that sureties are no longer liable for bonds written under conditions that were subsequently altered by a court.  In *U.S. v. LePicard*, 723 F.2d 663, 664-665 (9th Cir. 1984), the court concluded that the sureties could not be held bound by a new condition [imposed by a magistrate] to which they were not parties and to which they had not consented.

Opp'n at 8 (also citing *United States v. Galvez-Uriarte*, 709 F.2d 1323, 1324-25 (1983)).  But G&G has not shown that the May 24, 1999, voluntary departure date – or any specific date – was a condition of the Phing bond, particularly as that date was not specifically referenced on the face of the bond.  *Compare LePicard*, 723 F.2d at 664-65 (taking note that "[t]he bond as originally executed did not include the 'break no laws' condition").  In short, there was no bond condition "altered by a court."

## IV.   ISSUE NO. 3:

### LEGAL STATUS OF ALIEN

In their joint CMC statement, the parties identify two bond matters (both involving voluntary departure bonds) that address Issue No. 3: Phing and Abdullah.  Although the facts in each bond matter are different, G&G's basic contention for each matter is the same – *i.e.*, that, because each alien had legal status at the relevant time, they could not be subject to removal or departure and, accordingly, the bonds were automatically canceled.  The Court finds G&G's position more persuasive than the government's and further finds the government's position both arbitrary and

United States District Court
For the Northern District of California

capricious.  *At the time of the declared bond breach by the government*, Ms. Phing and Ms. Abdullah had legal status (and therefore were not subject to removal or departure), even if that legal status was subsequently revoked or changed.  Given that Ms. Phing and Ms. Abdullah each had legal status at the time of the declared bond breach, it is not reasonable to expect either alien to have voluntarily departed.  Similarly, it is not reasonable to expect G&G to ensure the voluntary departure of an alien who, at the time of the bond breach, had legal status.  Finally, it is not reasonable to put the burden on G&G to determine whether an application for legal status was properly or improperly granted. The Court therefore concludes that the agency's decisions as to Ms. Phing and Ms. Abdullah on Issue No. 3 were both arbitrary and capricious.

## V.   ISSUE NO. 4:

## DATE OF BREACH NOTICE

In their joint CMC statement, the parties identify only one bond matter that addresses Issue No. 4: Suinda.  Thus, the Court shall use the Suinda bond matter as a representative bond matter.

The basic dispute in Issue No. 4 concerns the date that the government notified G&G of the alleged breach of the Suinda bond.  The critical facts with respect to this issue are as follows:

- The Suinda bond provides in relevant part that "[a] voluntary departure bond is breached when the obligor fails to present valid proof that the bonded alien departed the United States on or before the date specified in the order granting voluntary departure within 30 days of that date."[4]  It also provides: "No Form I-323 [*i.e.*, breach notice] shall be sent to the obligor more than 180 days following the date of the breach, and any notice sent more than 180 days after the date of breach shall be unenforceable."[5]

---

[4] Opp'n (Suinda), Ex. B at 170 (1999 version of the immigration bond).

[5] Opp'n (Suinda), Ex. B at 170 (1999 version of the immigration bond).

Amwest I contains a similar provision: "INS agrees that no form I-323, Notice – Immigration Bond Breached, shall be sent to the obligor more than 180 days following the date of breach.  If the I-323 is not sent to the obligor within 180 days following the date of breach, then the declared breach shall be stale and unenforceable against the obligor.  However, the bond shall continue in full force and effect."  Opp'n (Suinda), Ex. B at 66-67 (Amwest I ¶ 9).

United States District Court

For the Northern District of California

- In November 2001, the IJ granted Mr. Suinda voluntary departure to take place within 60 days.[6]

- In December 2001, G&G posted a voluntary departure bond on Mr. Suinda's behalf.[7]

- Mr. Suinda appealed the decision of the IJ to the BIA and then to the Ninth Circuit.  In an April 2005 decision, the Ninth Circuit denied Mr. Suinda relief and stated that the stay of voluntary departure would expire upon issuance of the mandate.[8]  The mandate issued on July 26, 2005.[9]  The agency thus calculated that Mr. Suinda had to voluntarily depart by July 30, 2005.[10]

- Apparently, by August 29, 2005, G&G failed to provide evidence that Mr. Suinda had voluntarily departed by July 30, 2005.  Thus, under the terms of the Suinda bond, G&G was in breach.

- The agency thereafter prepared its notice of bond breach.  The notice was delivered to G&G on November 18, 2005[11] – *i.e.*, within 180 days of the bond breach, as required by the Suinda bond.  **The notice of bond breach, however, incorrectly stated that the bond had been breached on July 30, *2001* (instead of August 29, *2005*).**  This was clearly an error because, as stated on the notice itself, Mr. Suinda had to voluntarily depart by July 30, *2005*.  Clearly, there could be no breach until after the voluntary departure date.  Moreover, the July 2001 date was clearly an error because G&G did not even post the voluntary departure bond until December 2001.[12]

---

[6] *See* Opp'n (Suinda), Ex. B at 12, 32 (IJ oral decision).

[7] *See* Opp'n (Suinda), Ex. B at 34 (immigration bond).

[8] *See* Opp'n (Suinda), Ex. B at 52, 54 (Ninth Circuit order).

[9] *See* Opp'n (Suinda), Ex. B (Ninth Circuit docket sheet).

[10] *See* Opp'n (Suinda), Ex. B at 57 (agency worksheet).

[11] *See* Opp'n (Suinda), Ex. B at 58-59 (notice of bond breach and proof of delivery).

[12] In its papers, G&G makes much of the fact that the government

attached a different breach notice to its initial "Record of Proceedings" that it submitted before this Court.  In that breach notice, the 2005 year

1    G&G argues that, based on the above, "[a]t a minimum, a correct breach notice should be

2    issued.  However, since Mr. Suinda departed the country over six years ago, the bond should instead

3    be cancelled."  Mot. (Suinda) at 7.  In its decision below, the agency rejected G&G's argument

4    because the July 2001 date was an obvious typographical error.  *See* Opp'n (Suinda), Ex. A at 14

5    (agency decision) (noting that "the bond was not even posted until December 4, 2001, so by

6    definition it could not have been breached five months before it was issued").

7    The agency's decision was not arbitrary or capricious.  As the agency explained, the error on

8    the notice was obvious.  Moreover, even if there were a breach of the Suinda bond because of the

9    incorrect date, G&G must show that there a *material* breach that warrants cancellation.  *See* Docket

10   No. 244 (Order at 7-8) (noting that, "under traditional contract law, there must first be a material

11   breach before the nonbreaching party is entitled to a remedy and/or an excuse for nonperformance").

12   Here, G&G has not offered any evidence that the incorrect date affected its ability to ensure Mr.

13   Suinda's voluntary departure.  *See also* Opp'n (Suinda at 7) ("[N]either the age of, nor the

14   typographical error on, the breach determination have any bearing on G&G's failure to comply with

15   the bond.").

16   ### VI.   LATE VOLUNTARY DEPARTURE AND MITIGATION

17   ### ISSUE NO. 5:

18   In their joint CMC statement, the parties identify only one bond matter that addresses Issue

19   No. 5: Martins.  Thus, the Court shall use the Martins bond matter as a representative bond matter.

20   The basic dispute in Issue No. 5 concerns whether G&G substantially complied with the

21   terms of the bond when Mr. Martins voluntarily departed the country but did so approximately three

22   _____

23   is crossed out and 2001 is written in its place.  [*See* Nye Decl., Ex. 22.]

24   DHS has not provided any explanation as to why it would submit an altered breach notice to the Court.  This breach notice was never

25   mailed to G&G/ASC, and it did not appear in the A-file.  If the Court did order the production of the A-file, this alteration would not have

26   been discovered and would have been presumed by the Court to be an accurate reflection of DHS's records.

27   Mot. (Suinda) at 7.  But the bottom line is that the Court has in the administrative record the correct

28   document, and the facts are undisputed – *i.e.*, that the notice of bond breach that was sent to G&G
incorrectly stated that the bond was breached in July *2001*.

weeks *after* the voluntary departure date.  Substantial compliance is a principle that comes from the immigration regulations.  Title 8 C.F.R. § 103.6(c)(3) provides in relevant part: "Substantial performance of all conditions imposed by the terms of a bond shall release the obligor from liability."  8 C.F.R. § 103.6(c)(3).  Section 103.6(e) is the flip side of § 103.6(c)(3); it provides: "A bond is breached when there has been a substantial violation of the stipulated conditions."  *Id.* § 103.6(e).

The concept of substantial performance/substantial violation is also addressed in the two Amwest agreements.  Amwest I references the two regulations and then states as follows:

> CLARIFICATION: A substantial violation of the conditions of a bond occurs when the obligor fails to deliver the bonded alien as specified in a proper INS demand upon the surety to produce the alien and the bond is breached.  However, in addition to an obligor's right to mitigate a breach of a bond as provided in the settlement among the parties, the obligor may also be released from all liability under a bond and receive a bond cancellation with no penalty whatsoever if, in the discretion of the District Director, the obligor has substantially performed all of the conditions imposed by the terms of the bond, notwithstanding the failure to deliver the alien as demanded.
>
> In exercising discretion to cancel a bond based upon substantial performance, the district Director will evaluate and consider such factors as the extent of the breach, whether it was intentional or accidental on the part of the alien, whether the alien has acted in good faith, and whether the alien took steps to make amends or to place himself in compliance.

Opp'n (Martins), Ex. B at 36 (Amwest I, Ex. I).

Amwest II also references the two regulations and then states:

> The parties' intent was to make it clear that not every violation of a bond contract – including a failure to surrender the alien as required in a valid demand – constitutes a breach, and that sometimes less than full performance can entitle to obligor to cancellation of a bond.
>
> Decisions of whether to cancel or breach a bond under these regulations are clearly a matter within the District Director's discretion.  His or her exercise of this discretion must, however, be a reasoned one.  A District Director cannot read "substantial performance" as being full performance, or "substantial violation" as being any violation.  Such a reading "effectively [reads] the requirement of 'substantial' out of the regulation.  The regulation clearly provides that only upon a *substantial* violation may be a bond be forfeited, not upon *any* violation."

Opp'n (Martins), Ex. B at 58 (Amwest II, Ex. A) (field memo).

11

In its decision below, the agency concluded that compliance with the voluntary departure date is a fundamental requirement that cannot be excused, especially as it is mandated by law.  *See* Opp'n (Martins), Ex. A at 8-9 (agency decision); *see also* 8 U.S.C. § 1229c(a)(2)(A) (providing that, "[s]ubject to subparagraph (B), permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days").

That conclusion cannot be said to be arbitrary or capricious or even legally erroneous to the extent de novo review might apply.  As the government contends in its brief:

> No authority exists for the notion that failure to ensure that the alien departs the United States by the end of the VD period constituted substantial performance of a VD bond's terms and conditions. Because the VD date set by the IJ was the statutory-maximum period of 120 days, the VD date could not be extended by the alien or the bond obligor.

Opp'n (Martins) at 5.

In its papers, G&G argues that "DHS policy . . . appears to mandate cancellation of a voluntary departure bond if the alien departs within 30 days of the voluntary departure date."  Mot. (Martins) at 4 (citing Nye Decl., Ex. 14) (April 8, 2008, memorandum to all deportation field officers re: Immigration Bond Policies and Procedures).  But the policy that G&G cites does not state such.  It simply provides: "Compliance with Voluntary Departure (Verification of Departure) – Upon receipt of evidence of compliance with voluntary departure within thirty (30) days the bond will be cancelled."  Nye Decl., Ex. 14 (April 8, 2008, memorandum to all deportation field officers re: Immigration Bond Policies and Procedures).  Substantial compliance may well refer, *e.g.*, to the obligor's imperfect provision of probative evidence of voluntary departure.  *See* Mot. (Martins), Ex. B at 164 (1999 version of the immigration bond) ("A voluntary departure bond is breached when the obligor fails to present valid proof that the bonded alien departed the United States on or before the date specified in the order granting voluntary departure within 30 days of that date.").  Substantial compliance thus has meaning and effect even if the actual timely departure is deemed a fundamental obligation not subject to the "substantial compliance" rubric.

United States District Court

For the Northern District of California

1    To the extent G&G makes the point that the government was not prejudiced by the untimely

2    voluntary departure, *see* Reply (Martins) at 3, because the voluntary departure still happened and in

3    a relatively quick time frame, that may well be true.  But any untimely voluntary departure may still

4    fairly be deemed a substantial violation given the hard deadlines provided in the immigration statute.

5    *See* 8 U.S.C. § 1229(a)(2)(A) (limiting voluntary departure period to 120 days).  To the extent G&G

6    makes a mitigation argument, that argument is unavailing because mitigation applies to delivery

7    bonds, and here there is a voluntary departure bond, not a delivery bond.  *See, e.g.*, Opp'n, Ex. B at

8    53 (Amwest II, Ex. A) (field memo) (stating that, "[u]nder this new policy obligors have 30 days

9    from INS's notification of a breach 'in which the mitigate the breach by delivery of the alien in the

10   case of a delivery or an exclusion bond'").

11                              **VII.    ISSUE NO. 6:**

12                    **TRIGGER DATE FOR THREE-DAY NOTICE RULE**

13   In their joint CMC statement, the parties identify only one bond matter that addresses Issue

14   No. 6: Almeida-Bolanos.  Thus, the Court shall use the Almeida-Bolanos bond matter as a

15   representative bond matter.

16   The basic dispute in Issue No. 6 concerns the three-day notice rule – *i.e.*, the rule that the

17   agency was required to send a delivery demand to G&G and then wait at least three days before

18   notifying the alien of the required surrender (usually, through an I-166).

19   The three-day notice rule is required by both of the Amwest agreements.  Amwest I provides:

20   "INS agrees that if INS intends to notify the alien of the date and time of deportation, such notice

21   will not be mailed to the alien before, and not less than three days after, the demand to produce the

22   alien is mailed to the bond obligor."  Opp'n (Almeida-Bolanos), Ex. B at 46 (Amwest I ¶ 6).

23   Similarly, Amwest II provides:

24               Paragraph 6 of the Settlement requires that INS send notice of a
              surrender date and time for deportation/removal to obligors at least
25               three days in advance of sending such notice to the bonded alien. . . .
              Failure to do so will render any attempt to breach the bond for failure
26               to surrender that date null and void.  Failure to give the obligor the
              requisite notice will entitle it to rescission of any breach.  It will not
27               affect the status of the bond itself, however, and INS may (assuming
              no intervening event requires cancellation) issue another demand.

28

1   Opp'n (Almeida-Bolanos), Ex. B at 84 (Amwest II, Ex. A) (field memo).

2       According to G&G, the agency violated the three-day notice rule in the Almeida-Bolanos

3   bond matter because it mailed the delivery demand to G&G on August 27, 2003, and then mailed the

4   I-166 to Mr. Almeida-Bolanos only two days later, *i.e.*, on August 29, 2003.  G&G admits that the

5   date listed on the delivery demand is August 26, 2003.  However, it points out that there is evidence

6   to support an actual mailing date of August 27, 2003 – *i.e.*, the postmark on the envelope containing

7   the delivery demand.[13]  *See* Nye Decl., Ex. 12 (envelope).  As for the mailing to Mr. Almeida-

8   Bolanos, G&G admits that there is no actual evidence of the date of mailing; there is only evidence

9   that the I-166 had on its face the date August 29, 2003.  However, G&G points out that, in its

10  decision below, the agency stated that it sent the I-166 on August 29, 2003.  *See* Opp'n (Almeida-

11  Bolanos), Ex. A at 4 (agency decision).  G&G also argues that the government easily could have – if

12  it had wished – kept evidence of actual mailing date.  Moreover, a mailing date of August 30, 2003,

13  would be unlikely because that was a Saturday.

14      In its decision below, the agency rejected G&G's argument on the following grounds:

15          The Bond Obligors have submitted a supplemental document from
        G&G's records showing that the demand notice, which was dated
16          August 26, 2003, was delivered in an envelope stamped with several
        different postmarks, one appearing to be August 27, 2003.  No
17          envelope containing Form I-166, however, is present in the
        administrative record.  The absence of this envelope is expected
18          because Form I-166 was delivered by certified mail to Mr. Almeida-
        Bolanos, and he would be in possession of the envelope. . . .
19
20          Upon review, the Agency concludes that Form I-166 was
        timely sent to the alien vis-a-vis the issuance of the demand notice to
21          the Bond Obligors.  First, the Amwest settlement agreements do not
        specify that the date of mailing is the date appearing on a postmark.
22          Given that a postmarked envelope containing Form I-166 will not be
        available either to the Agency or the Bond Obligors when it is
23          delivered to the alien, it would be untenable to rely on the postmark
        date as proof of the date of mailing.  It is more reasonable to use the
24          date appearing on the notices as a proxy for the date of mailing.  The
        dates on the demand notice and Form I-166 are readily available, and
25          they have the added benefit of reflecting whether or not the Agency
        intended to wait three days before mailing Form I-166 to the alien. . . .

26

27          [13] In its decision below, the agency stated that the envelope was "stamped with several
    different postmarks, one appearing to be August 27, 2003."  Opp'n (Almeida-Bolanos), Ex. A at 8
28  (agency decision).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Second, the certified mail receipts in this case confirm that G&G received the intended benefit of the "three-day advance mailing" rule regardless [of] when the envelopes may have been postmarked. The certified mail receipt shows that G&G received the demand notice on September 2, 2003.  The certified mail receipt shows that Mr. Almeida-Bolanos received Form I-166 on September 6, 2003. . . . Invalidating the breach determination based on speculation that the envelope containing Form I-166 may have been postmarked on August 29, 2003 is not reasonable when the evidence shows that G&G received the demand notice more than three days before the alien received Form I-166.

Opp'n (Almeida-Bolanos), Ex. A at 8-9 (agency decision).

As a preliminary matter, the Court notes that it shall review the agency's decision here de novo, and not under the arbitrary-and-capricious standard.  This is because the resolution of the issue before the Court – *i.e.*, the factual question of when the demand notice and the I-166 were sent – does not turn on any agency expertise.

Turning to the factual question of when the two notices were went, there is undisputed evidence before the Court that the demand notice was sent to G&G on August 27, 2003.[14]  The only question remaining is when the I-166 was sent to Mr. Almeida-Bolanos.  Here, the Court concludes that, in the absence of any evidence to the contrary, it is reasonable to presume that the I-166 was mailed on the date listed on the document, *i.e.*, August 29, 2003.  It is unlikely that the I-166 was mailed on either August 30 or 31, 2003, as those days were Saturday and Sunday, respectively.  And while there is evidence that Mr. Almeida-Bolanos did not actually receive the I-166 until September 6, 2003, the delay in mailing could be attributed to the intervening weekend.  Accordingly, the Court concludes that the three-day notice rule was violated in Mr. Almeida-Bolanos's case.

## VIII.    SUPPLEMENTAL BRIEFING ISSUE NO. 1:

## TIMELY DELIVERY DEMAND FOLLOWED BY UNTIMELY DELIVERY DEMAND

The issue as presented by the government in its supplemental brief is related to two subjects that the Court previously addressed in its first summary judgment order: (1) the requirement that a delivery demand be served on G&G within the ninety-day removal period and (2) the ability of the

---

[14] As indicated above, both Amwest I and Amwest II, on their face, frame the three-day notice rule in terms of when the notice is sent or mailed to the alien, and not to when the notice is received.

government to issue a second delivery demand (*i.e.*, after the first delivery demand was rescinded because it was not provided at least three days before notice to the alien).  Although the government previously identified the Grama bond matter as a representative bond matter for this issue, *see* Docket No. 247 (Joint CMC St. at 3-4), it now identifies the Antonio bond matter as a representative bond matter.

With regard to the Antonio bond matter, the critical facts are as follows:

- On or about August 2, 2004, G&G issued a delivery bond on behalf of Mr. Antonio.  *See* Opp'n (Antonio), Ex. B at 4 (immigration bond).

- On or about October 27, 2004, an IJ ordered that Mr. Antonio be removed.  *See* Opp'n (Antonio), Ex. B at 6 (IJ order).

- On or about November 4, 2004, the government issued a delivery demand to G&G to produce Mr. Antonio for deportation.  *See* Opp'n (Antonio), Ex. B at 7 (delivery demand). **This delivery demand was made within the ninety-day removal period.  The delivery demand, however, was defective because it was not issued three days before the I-166 notice to the alien.** *See* Opp'n (Antonio), Ex. B at 10 (I-166) (I-166 issued on November 4, 2004, the same day the delivery demand to G&G was issued).

- On or about December 20, 2004, the government declared the bond breached based on G&G's failure to deliver Mr. Antonio in compliance with the delivery demand.  *See* Opp'n (Antonio), Ex. B at 11 (notice of immigration bond breach).  But approximately five years later, on or about September 23, 2009, the government rescinded the bond breach declaration – implicitly because the delivery demand was not issued in compliance with the three-day advance notice requirement.  *See* Opp'n (Antonio), Ex. B at 13 (notice of decision).

- On or about January 26, 2011, the government issued a new delivery demand and, in compliance with the Amwest Agreements, issued a new I-166 more than three days later. *See* Opp'n (Antonio), Ex. B at 14 (delivery demand); Opp'n (Antonio), Ex. B at 18 (I-166). **Clearly, this delivery demand was well past the ninety-day removal period** (*i.e.*, more than six years past the period).

16

1    Although the second delivery demand was clearly outside the ninety-day removal period, the

2    government argues that it should still be given effect because (1) the first delivery demand was

3    within the ninety-day removal period and (2) it was defective only because of a technical reason,

4    *i.e.*, a failure to comply with the three-day advance notice rule.  According to the government, it

5    should be given "a reasonable time to correct a technical error."  Docket No. 251 (Supp. Br. at 1).

6    The government argues:

7         DHS's right to rescind a breach and reissue a delivery demand
          realistically can only be exercised if it may issue the *second* demand
8         after the 90-day removal period.  This is particularly true when the
          rescission is based upon a latent defect that cannot be readily detected,
9         or when the rescission is based on DHS's failure to send a breach
          notice within 180 days of a breach.  G&G cannot ignore a timely
10        demand, wait for DHS's "authority" to expire, and prevent DHS from
          exercising its right to remedy the mistake.

11

12   Docket No. 251 (Supp. Br. at 1) (emphasis in original).

13       The government's argument is problematic for several reasons.  First, the agency never

14   articulated this reasoning in its decision below.  The Court cannot affirm an agency decision based

15   on a rationale not actually relied on by the agency.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196

16   (1946) (noting that a court reviewing agency action "must judge the propriety of such action solely

17   on the grounds invoked by the agency" and, "[i]f those grounds are inadequate or improper, the

18   court is powerless to affirm the administrative action by substituting what it considers to be a more

19   adequate or proper basis.")

20       Second, even if the Court were to entertain the merits, the government's reliance on Amwest

21   II is misplaced.  Amwest II provides that "[f]ailure to give the obligor the requisite [three-day]

22   notice will entitle it to rescission of any breach.  It will not affect the status of the bond itself,

23   however, and INS may (*assuming no intervening event requires cancellation*) issue another

24   demand."  Opp'n, Ex. B at 59 (Amwest II, Ex. A) (INS field memo) (emphasis added).  Here, there

25   was an intervening event requiring cancellation – *i.e.*, the expiration of the ninety-day removal

26   period.  Once that period expires, the bond is unenforceable.  *See* Docket No. 244 (Order at 14-15)

27   (holding that it was arbitrary and capricious for the agency to conclude that "it was not required to

28   issue a delivery demand within the ninety-day removal period, *i.e.*, during the period that it had the

United States District Court

For the Northern District of California

17

United States District Court

For the Northern District of California

1  authority to detain").  Moreover, the government has not provided a good explanation of why it

2  could not issue a second delivery demand within the ninety-day removal period.  For example, for

3  the Antonio bond matter, it should have been a fairly obvious mistake that the delivery demand and

4  I-166 were issued on the same day.  Even if an error were not that obvious, the fact remains that the

5  government should have full control over the situation – *i.e.*, any error would be solely one of its

6  own making.  Finally, the government ignores the fact that G&G runs a risk from ignoring a timely

7  delivery demand, namely, that it could be held in breach.  The government also ignores the fact that

8  the three-day notice rule is not an insignificant requirement; it gives G&G the opportunity to locate

9  and deliver the alien before he or she learns of the need to appear and "runs."  The failure to comply

10  is not a mere technicality; it affects G&G's risk.

11  Furthermore, the government's construction would introduce uncertainty into enforcement:

12  what is "a reasonable time to correct a technical error"?  Docket No. 251 (Supp. Br. at 1).  A bright-

13  line rule (*i.e.*, once the ninety-day removal period has expired, then the bond is invalid) would

14  provide all parties with certainty.  Nor has the government identified a legal source for its

15  "reasonable time" theory.  In any event, for the Antonio bond matter, the government cannot argue

16  that it corrected its error within a "reasonable time."  The agency did not issue a second delivery

17  demand until well outside the ninety-day removal period – in fact, not until over six *years* later.

## IX.  SUPPLEMENTAL BRIEFING ISSUE NO. 2:

## TRIGGER FOR THREE-DAY ADVANCE NOTICE RULE

20  The issue as presented in the supplemental briefing was raised in conjunction with the prior

21  bond matters.  It concerns when the three-day advance notice rule is triggered.  The government

22  points to the Singh bond matter as a representative bond matter.

23  According to the government, the agency has an obligation to wait three days only when it

24  notifies the alien of a need to surrender *for removal* – and not, *e.g.*, when it is simply seeking the

25  alien's appearance *for an interview or case review*.  *See* Docket No. 251 (Supp. Br. at 2); *see also*

26  Opp'n (Singh), Ex. A at 11 (agency decision) (noting that the delivery demand "did not include a

27  specific date for deportation/removal; rather, it required the Bond Obligors to surrender the alien at a

28  specified date and place for an interview/case review").

The government's position is persuasive.  For example, the immigration bond form for Mr. Singh provided: "No demand to produce the bonded alien *for deportation/removal* shall be sent less than three days prior to sending notice to the bonded alien."  Opp'n (Singh), Ex. B at 990 (general terms and conditions for immigration bond).  Also, Amwest I provided: "INS agrees that if INS intends to notify the alien of *the date and time of deportation*, such notice will not be mailed to the alien before, and not less than 3 days after, the demand to produce the alien is mailed to the bond obligor."  Opp'n (Singh), Ex. B at 59 (Amwest I ¶ 6) (emphasis added).  No mention is made in Amwest I of a notice for interview or case review.  Admittedly, G&G's contention – *i.e.*, that, "[o]nce an immigrant knows that he or she must surrender to DHS, even if it is not for removal, the risk of flight increases," Reply (Singh) at 4 – has some merit.  *See also* Docket No. 252 (Supp. Br. at 2) (stating that "[t]he risk of an alien fleeing in response to any demand to surrender, whether for an 'interview and case review' or deportation/removal, is very high when the alien is subject to a final order of removal").  Nevertheless, given the plain language of the bond and Amwest agreements, it cannot be said that the agency's interpretation of the agreements is arbitrary and capricious.

## X.   SUPPLEMENTAL BRIEFING ISSUE NO. 3:
## ABSENCE OF ADDRESS ON QUESTIONNAIRE

The issue as presented in the supplemental briefing concerns the Questionnaire that the agency provides to G&G at the time it issues the delivery demand.  As the Court noted in its prior summary judgment order,

> [i]n Amwest II, the agency agreed that, at the time it would [issue] the delivery demand to G&G, it would also provide G&G with a "Questionnaire."  The Questionnaire is an information sheet for the benefit of G&G – *i.e.*, to help it locate the alien.  One piece of information to be provided with the Questionnaire is the alien's address.

Docket No. 244 (Order at 18).  According to the government, in a situation in which the agency failed to put *any* address on the Questionnaire, that cannot be deemed a material breach of the Amwest II agreement so long as the most recent address the agency had for the alien (as reflected in the A-file) was the address listed on the bond form.  *See* Docket No. 251 (Supp. Br. at 3).  The government points to the Vasquez-Rodas bond matter as a representative matter.  *See* Opp'n

United States District Court

For the Northern District of California

1  (Vasquez-Rodas), Ex. A at 9 (agency decision) (stating that, "[w]hen the alien's address is still the

2  same as the address on the bond form, ICE is not required to include an address on the Questionnaire

3  and Worksheet because the bond obligors already know the alien's address in that situation"); Opp'n

4  (Vasquez-Rodas) at 3 (stating that "the agency did not include a 'new' address on the Questionnaire

5  when it sent G&G the I-340 because there was no 'new' address – the most recent address in the A-

6  file for the alien was the one provided on the bond form by G&G").

7         The government's analysis in its supplemental brief is on point.  Even if the agency

8  technically violated the Amwest II agreement by not putting any address on the Questionnaire (and

9  it is debatable whether there was a breach for the reasons stated by the agency), such a violation in

10 of and itself does not automatically give rise to a remedy.  Because no remedy is specified in the

11 Amwest II or any other agreement for such a breach, under normal contract principles described in

12 the Court's prior order, G&G should be entitled to a remedy only where the breach was material.

13 Here, the breach was not material because the last known address the government had for Mr.

14 Vasquez-Rodas was the same address as that on the bond form.  Moreover, G&G has not provided

15 any evidence to indicate that it was not able to deliver Mr. Vasquez-Rodas to the agency because of

16 the address issue.

### XI.    SUPPLEMENTAL BRIEFING ISSUE NO. 4:
### NOTICE OF VOLUNTARY DEPARTURE GRANT

19        The issue here is whether the agency had an obligation to give G&G notice that an alien had

20 been granted voluntary departure where the bond posted by G&G was a delivery bond, and not a

21 voluntary departure bond.  The government points to the Lee bond matter as a representative matter.

22        In Ms. Lee's case, G&G posted a delivery bond which included the following provision:

> INS shall notify the obligor of a demand to produce the alien, the breach or cancellation of a bond, and any demand for payment of a bond.  Paragraph seven of the settlement in AMWEST SURETY v. RENO, No. 93-3256 JSL (SHx) (C.D. CA) requires that INS send a copy of any new or amended Notice to Appear or amended Order to Show Cause to the obligor.  *INS is not required to give the obligor notice of any other actions related to the bonded alien's immigration court proceedings.*

United States District Court

For the Northern District of California

1   Mot. (Lee), Ex. B at 962 (1999 version of the immigration bond) (emphasis added).  Subsequently,

2   an IJ issued an order granting Ms. Lee's application for voluntary departure.  *See* Mot. (Lee), Ex. B

3   at 8 (IJ order).  There does not appear to be any dispute that the government never informed G&G of

4   the grant of voluntary departure.

5          In its decision below, the agency stated that "DHS is not required to notify the Bond

6   Obligors of the voluntary departure order" because "[n]o provision in the bond form or in the

7   Amwest settlement agreements requires such a notification."  Mot. (Lee), Ex. A at 23 n.6 (agency

8   decision).  This reasoning was not arbitrary or capricious, particularly in light of the italicized

9   language in the above provision.

10         The arguments that G&G makes in its supplemental brief are not persuasive.  In essence,

11  G&G contends that, because the agency failed to provide Ms. Lee was voluntary departure

12  instructions (as required by the Amwest agreements),

13             at the very least, DHS should [have] directly notif[ied] G&G of the
              order of voluntary departure so that G&G [could] take matters into its
14             own hands to contact the alien and insure his or her voluntary
              departure in accordance with DHS's requirements (and/or G&G could
15             request the alien post a voluntary departure bond to significantly
              reduce its exposure).

16

17  Docket No. 252 (Supp. Br. at 4).  But the Court already ruled in its prior summary judgment order

18  that a failure to provide voluntary departure instructions, though required under Amwest I and II, did

19  not provide bases for relief in the absence of a showing by G&G that the failure to do so was

20  material.  *See* Docket No. 244 (Order at 30-31).  While it would be ideal to give G&G notice of

21  voluntary departure for a number of reasons, the fact remains that G&G's rights, as obligor under a

22  delivery bond, are protected by the notice provisions pertaining to a delivery demand discussed

23  above.  Moreover, as this Court held in its previous order, there is no right of G&G to convert a

24  delivery bond into a voluntary departure bond.

25             **XII.    SUPPLEMENTAL BRIEFING ISSUE NO. 5:**

26         **UNCONDITIONAL V. CONDITIONAL OFFER TO PAY THE GOVERNMENT**

27         The final issue relates to G&G's pre-litigation offers to pay the principal debt, which

28  ultimately led the Court to conclude that penalties should not be assessed on any day thereafter.  The

government points to the Almeida-Bolanos bond matter as a representative matter.  The relevant facts in the Almeida-Bolanos bond matter are as follows:

- On March 10, 2005, the agency sent a letter to G&G, addressing G&G's proposal that it "pay the government the money due on the breached immigration bonds and then immediately sue the government under the jurisdiction of the Little Tucker Act to create causes of action for money damages."  Docket No. 189-3 (Nye Decl., Ex. H) (letter).  The agency rejected the proposal, stating that, "[b]ecause it is clear from your proposal that G&G does not believe any money is due on account of the breached bonds, any money tendered by your client would not be in true satisfaction of the bonds.  Instead, the money paid to the government would be for the sole purpose of rigging jurisdiction under the Little Tucker Act."  Docket No. 189-3 (Nye Decl., Ex. H) (letter).  The agency continued: "Judicial review of the breached immigration bonds is available to G&G through appeal of breach declarations to DHS' Administrative Appeals Office ('AAO') and then to United States District Courts under the Administrative Procedures Act ('APA')."  Docket No. 189-3 (Nye Decl., Ex. H) (letter).

- Although the government rejected the proposal, G&G nevertheless sent a check to the government on April 6, 2005, on an alleged bond breach (regarding an alien different from Mr. Almeida-Bolanos).  *See* Docket No. 189-3 (Nye Decl., Ex. I) (letter).

- On April 13, 2005, the agency sent a letter to G&G stating that it had received from G&G "eleven 'under protest' checks as payment on immigration bonds."  Docket No. 189-3 (Nye Decl., Ex. J) (letter).  The agency refused to accept the checks because they were not "tendered in good faith satisfaction of any debt, and [were] solely to manipulate jurisdiction under the Little Tucker Act."  Docket No. 189-3 (Nye Decl., Ex. J) (letter) (also stating that this was "a calculated attempt to evade the review process set forth under the Administrative Procedures Act ('APA') for appeals from DHS' Administrative Appeals Office ('AAO')").

- In spite of the above history, on August 9, 2007, G&G sent the government a check covering "the penal sum in connection with the alleged bond breach" on some 20 different bonds (none involving Mr. Almeida-Bolanos).  Docket No. 189-3 (Nye Decl., Ex. K) (letter).

United States District Court

For the Northern District of California

- The agency responded on September 7, 2007, stating that it was not accepting the payment for the reasons articulated in its letter of April 13, 2005.  *See* Docket No. 189-3 (Nye Decl., Ex. L) (letter).

- On October 25, 2007, G&G sent a letter in reply, stating that it would not accept the government's attempt to return the money.  G&G then went on to "offer[] to pay DHS, under protest and with a full reservation of G&G's rights, the full penal sum on all remaining bonds which DHS claims G&G breached.  **In return, we would expect that DHS would waive Sovereign Immunity so that G&G and the DHS would be able to obtain a judicial determination of the legal issues which have remained unresolved for many years** . . . . Paying the amounts allegedly due under protest allows G&G to reserve its rights to seek a refund of the paid amounts in the event that G&G chooses to file suit against the Government based upon breaches that G&G contends were unlawfully declared by DHS."  Docket No. 189-3 (Nye Decl., Ex. M) (letter).  G&G continued: "We do not understand how the government can refuse to accept money tendered to it, nor can we locate any statute or regulation authorizing DHS to reject payments simply because they are made under protest. The government clearly accepts payments made under protest.  *See Brazos Elec. Power Co-op, Inc. v. U.S.*, 144 F.3d 784, 786 (Fed. Cir. 1998) (A Tucker Act case where the government accepted payments under protest.)" Docket No. 189-3 (Nye Decl., Ex. M) (letter).

Based on this basic history, the Court held that penalties should not have been assessed against G&G once it made its offer to pay the principal debt.  The Court stated:

> In this case, G&G's tender was not conditioned on the government giving up any legal rights or waiving any claims.  The only thing G&G asked was that G&G not be deemed to have waived its right to contest the validity of the bonds in bringing an action seeking a refund.  That ICE preferred a different forum and procedure for adjudicating the claims is not a good and sufficient reason to allow it to continue to assess penalties on the sum tendered by G&G.

Docket No. 244 (Order at 39-40).

In its supplemental brief, the government now questions whether, in October 2007, G&G really made an unconditional offer to pay because, as reflected in the letter, G&G stated that it

United States District Court

For the Northern District of California

1 would expect the government to waive sovereign immunity.  The government adds that it "could not

2 have accepted G&G's conditional payment offer because it did not have authority to waive

3 sovereign immunity" – only Congress can.  Docket No. 251 (Supp. Br. at 5).  At the hearing, the

4 government also tendered for he first time a letter that the agency sent to G&G on November 8,

5 2007, to which G&G never responded.

6      The Court rejects the government's argument.  First, it is in essence a motion to reconsider

7 but the government has made no real effort to show that it has met the requirements for

8 reconsideration as laid out in Civil Local Rule 7-9(b).  *See, e.g.*, Civ. L.R. 7-9(b) (providing that a

9 party must show "[a] manifest failure by the Court to consider material facts or dispositive legal

10 arguments *which were presented to the Court before such interlocutory order*") (emphasis added).

11 The government never previously argued to the Court that G&G's offer to pay was not

12 unconditional.[15]

13      Second, even if the government had, it would be no better off.  G&G's reference to waiver of

14 sovereign immunity was simply a reference to an argument that it had made before with respect to

15 the Little Tucker Act.  The Little Tucker Act provides for a waiver of sovereign immunity.  *See*

16 *Munoz v. Mabus*, 630 F.3d 856, 863 n.5 (9th Cir. 2010) (stating that "Congress has effected a limited

17 waiver of sovereign immunity in [damage actions in contract against the United States] pursuant to

18 the Tucker and Little Tucker Acts").  And as the Court indicated in its prior summary judgment

19 order, the reference to the Little Tucker Act should not be viewed as a conditional offer to pay

20 because it simply created a dispute as to *which forum* the disagreement between the parties would be

21 litigated.

22

23

24

---

25     [15] In Almeida-Bolanos, the government never explicitly argued that G&G's offer to pay was

26 a problem because it was not conditional.  In discussing the Little Tucker Act, the government
simply stated as follows: "Though G&G complains that it 'has been pursuing adjudication of the

27 disputed bond breach issues for over a decade,' it fails to note that it was its own jurisdictional
pleading defects that slowed court resolution.  Even with clear guidance from this Court, G&G

28 nonetheless persisted in asserting Little Tucker Act claims rather than APA claims."  Opp'n
(Almeida-Bolanos) at 9.

### XIII.   CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1)   Fnu Siao Phing.  The government's motion (Docket No. 157) is denied.  G&G's motion (Docket No. 208) is granted.

(2)   Mumtaz Hassanali Abdullah.  The government's motion (Docket No. 162) is denied.  G&G's motion (Docket No. 201) is granted.

(3)   Roberto Almeida-Bolanos.  G&G's motion (Docket No. 178) is granted.  The government's motion (Docket No. 196) is denied.

(4)   Vidal Vasquez-Rodas.  G&G's motion (Docket No. 180) is denied.  The government's motion (Docket No. 197) is granted.

(5)   Athos Martins.  G&G's motion (Docket No. 184) is denied.  The government's motion (Docket No. 199) is granted.

(6)   Winny Suinda.  G&G's motion (Docket No. 186) is denied.  The government's motion (Docket No. 200) is granted.

For the supplemental issues discussed above, the Court issues its summary adjudication rulings, for the reasons stated above.

It is the Court's understanding that, because of its summary judgment rulings, either previously or herein, the motions at Docket Nos. 158, 160, 161, and 164 (Chum-Garcia, Grama, Munoz-Piedras, and Villasenor-Ramirez bond matters) are now moot.

This order disposes of Docket Nos. 157, 162, 178, 180, 184, and 186.

A Status Conference is scheduled for October 1, 2015, at 10:30 a.m. to discuss resolution of all outstanding bonds.  A Joint Status Conference statement shall be filed by September 24, 2015.

IT IS SO ORDERED.

Dated:  August 19, 2015

_____
EDWARD M. CHEN
United States District Judge

25